## Condemnation of Water Distribution Mains and Appurtenances Owned by Berkmont Industries, Inc., etc. Borough of Boyertown, Petitioner.

Argued June 11, 1982, before Judges BLATT, WIL-
LIAMS, JR. and DOYLE, sitting as a panel of three.

*Robert 1. Cottom, Matten and Cottom,* for petitioner.

*Raymond C. Schlegel,* with him *Carl F. Mogel* and *Karen Lee Turner, Mogel, Speidel and Roland,* and *J. Gregg Miller* and *Barbara H. Sagar, Pepper, Hamilton & Sheetz,* for respondent.

OPINION BY JUDGE WILLIAMS, JR., October 4, 1983:

The Borough of Boyertown (Borough) has appealed from an order of the Court of Common Pleas of Berks County dismissing the Borough's preliminary objections to a petition under Section 502(e) of the Eminent Domain Code[1] for the appointment of a board of viewers. The petition had been filed by Berkmont Industries, Incorporated (Berkmont), and asserted that the Borough had committed a *de facto* taking as to certain property allegedly belonging to the petitioner.

The facts of this case are highly complex, and span a period of more than fifty years. Unlike the usual eminent domain matter, the instant case does not involve a taking or injury of a person's interest in land, as such, or a building. The *res* of this litigation is a system of water-distribution mains, which have been installed in the ground under public streets. Berkmont, claiming ownership of the distribution mains, asserted that the Borough committed a *de facto* taking by making an unauthorized connection to the mains, and by using that connection to supply water to certain additional customers of the Borough's water system.

---

[1] Act of June 22, 1964, Special Sess., P.L. 84, *as amended,* 26 P.S. §1-502(e).

## Background

In 1927, one J. Clifford Levengood owned a tract of land located partly in the Borough of Boyertown, Berks County, and partly in Douglass Township, Montgomery County. The Levengood tract is divided by Route 73, which is also known as East Philadelphia Avenue. Thus, part of the tract is also north of East Philadelphia Avenue, and part is to the south of it. Desiring to develop his property as building lots, Levengood entered into two agreements with the Borough to supply the tract with water from the Borough's water system.

The first agreement, dated 1927, included the following provisions:

1. The Borough permitted Levengood to connect a water main with the Borough main.

2. The Borough agreed to supply water for houses erected, or to be erected, on Levengood's property.

3. Levengood agreed to lay the main in a specified manner subject to the Borough's supervision and instruction.

4. The Borough was to receive the water rents from the customers.

5. Levengood could permit other property owners whose land abutted a street in which Levengood had laid a main to connect to such main if: (a) Levengood obtained the written consent of the Borough; and (b) the consumer agreed to pay the Borough for the water service.

The agreement also provided that:

6. Levengood could charge such other property owners the *pro rata* share of his expenses incurred in the construction of the main, based

upon the per front [footage] of property abutting the main.

7. If any of Levengood's property in Douglass Township should be annexed into the Borough, the main in the annexed area would become the sole property of the Borough.

8. The Borough agreed to maintain and repair the main after installation.

Pursuant to that agreement, the first Levengood main was installed, running eastward along East Philadelphia Avenue into Douglass Township, from the terminus of the Borough's main in East Philadelphia Avenue. That terminus was at the boundary line separating the Borough, which is in Berks County, from Douglass Township, which is in Montgomery County.

In 1928, based on an essentially identical agreement with the Borough, Levengood installed a second main. This one extended from his first main, and ran northward in the bed of a street called Montgomery Avenue. Both the first Levengood main and the second were entirely within Douglass Township.

By 1946, Levengood had sold portions of his tract, presumably as building lots. In January 1946, Levengood and his wife sold the remainder of the tract, together with such interest as they had in the two water mains, to Boyertown Realty Corporation (BRC).

Between 1947 and 1956, BRC laid several new water mains to serve its tract. Those new mains were installed in the beds of Rhoads Avenue, Highland Avenue, and Douglass Street, all of which, like East Philadelphia Avenue, are public streets running through the BRC tract. BRC also extended the main that Levengood had installed in East Philadelphia Avenue. The mains installed by BRC may be summarized as follows:

1. A main installed in 1947 in a section of Highland Avenue that is within Borough limits.

2. A main installed in 1947 in a section of Rhoads Avenue that is within Borough limits.

3. A main installed in 1948 in a section of Rhoads Avenue that is within Douglass Township.

4. An extension main added in 1951 to the main in the Douglass Township section of Rhoads Avenue. This extension is entirely within Douglass Township.

5. Mains installed or added in 1953 in Douglass Street, Rhoads Avenue and Highland Avenue. All of these mains are entirely within Douglass Township.

6. An extension main added in 1953 to the original Levengood main in East Philadelphia Avenue. This extension is entirely within Douglass Township.

7. An extension main added in 1954 to the main in the Borough section of Highland Avenue. This extension is entirely within Borough limits.

8. A main installed in 1956 in Douglass Street, which is entirely within Douglass Township.

BRC's installation of the foregoing water mains was done pursuant to the consent and supervision of the Borough in each instance.[2] Yet, BRC and the Borough entered into only one formal written agreement. That agreement was dated February 6, 1950, and related back to the main installed in Rhoads Avenue in 1948. The agreement of February 6, 1950, was, for

---

[2] The mains installed by BRC in 1947, in Highland Avenue and Rhoads Avenue, were extensions from Borough mains.

the most part, essentially identical to the Levengood agreements of 1927 and 1928. There was, however, one variation: as to persons who owned property abutting the main, and who wished to connect to the main, the 1950 agreement did not purport to restrict BRC to the right of recouping a *pro rata* share of installation costs, as did the Levengood agreements. Indeed, the 1950 agreement was entirely silent on the point.

The water mains installed by Levengood and by BRC formed two separate divisions: one division was in and north of East Philadelphia Avenue; the other division was south of that street. The two divisions had not been connected; hence, water could not have flowed from one to the other. To improve circulation in those mains, the Borough, at some time in the early 1960's, installed a "looping" main that connected the two divisions. The "looping" main was run from the northeasterly end of the BRC-installed main in Douglass Street, and made to connect with the terminus of BRC's addition to the main in East Philadelphia Avenue. The "looping" main, like the two points it connected, was entirely in Douglass Township.

In 1964, the Commonwealth of Pennsylvania relocated Route 100 to a point just east of the terminus of the main in East Philadelphia Avenue. For the purpose of making public water available to areas east of the new Route 100, the Borough, *at its own expense,* extended the East Philadelphia Avenue main from its then existing terminus to a point across the new Route 100. That extension was entirely in Douglass Township. Prior to making the 1964 extension, the Borough advised BRC that the extension was being made *without prejudice to any agreements between*

*them.* The Borough also stated that the extension would entail no charge to BRC and was to be installed *strictly as a public accommodation.*

In 1966, BRC was merged into the Union Manufacturing Company, which, in 1967, was merged into Fashion Hosiery Mills. In connection with the latter merger, Fashion Hosiery Mills changed its name to Berkmont Industries, Incorporated, the appellee herein.

We turn now to the facts that triggered the instant case. About November 1976, the Borough made another extension to the water main in East Philadelphia Avenue. This addition *connected to the Borough's 1964 extension across Route 100,* and ran eastward in East Philadelphia Avenue to the Gilbertsville Shopping Center in Douglass Township. The 1976 extension, though installed by the Borough, was paid for by the private developer of the shopping center. In 1978, the Borough made yet another eastward extension of the same main, this time to Zern's Market, which paid for the installation.

On March 22, 1977, Berkmont filed, in the Court of Common Pleas of Berks County, a petition under Section 502(e) of the Eminent Domain Code (Code) for the appointment of a board of viewers. The petition averred that, as of November 11, 1976, Berkmont was the owner of the water mains that had been installed by Levengood and by BRC in East Philadelphia Avenue, Montgomery Avenue, Rhoads Avenue, Highland Avenue, and Douglass Street. The petition also averred that the Borough, on or about November 11, 1976, had extended Berkmont's mains to serve other Borough customers in Douglass Township, and that the extension was made without the consent of Berkmont. The petition further averred that the Bor-

ough, by making the November 1976 extension, deprived Berkmont of the incidents of its ownership of the mains that had been installed by Levengood and BRC. Based on the foregoing averments, and the further averment that the Borough had not filed a declaration of taking, the petition went on to assert that the Borough's extension constituted a *de facto* taking of Berkmont's mains.

The Borough filed preliminary objections which (1) raised the defense of a statute of limitations, and (2) asserted that Berkmont's petition did not state a cause of action. The trial court ruled that the preliminary objections could not be used to raise the statute of limitations. However, the court did agree that the petition for viewers did not set forth a cause of action. Upon sustaining that element of the Borough's demurrer, the court gave Berkmont leave to file an amended petition.

On February 28, 1978, Berkmont filed an amended petition, which repeated the averments made in the original petition, and added the following new averments:

(1) That the Borough, in making the November 1976 extension, and allowing other customers to connect thereto, did so without paying Berkmont the connection fees to which it was entitled under existing agreements.

(2) That the Borough's use of the November 1976 extension interferes with Berkmont's use and enjoyment of its mains, and subjects Berkmont's mains to an additional servitude for which Berkmont has not been paid the connection fees to which it is entitled.

(3) That the Borough's use of the November 1976 extension depreciates the value of

Berkmont's mains by increasing the wear and tear on them.

(4) That the Borough's use of the November 1976 extension restricts Berkmont's right and ability to use its mains.

(5) That the Borough's use of the November 1976 extension will require Berkmont to replace its mains sooner than usual, because of the increased use of them.

The amended petition renewed Berkmont's assertion that the installation and use of the November 1976 extension constituted a *de facto* taking of Berkmont's mains.

The Borough filed preliminary objections to the amended petition, and again made a general assertion that Berkmont had failed to state a cause of action for a *de facto* taking. More specifically, the preliminary objections also asserted that, given the Borough's agreements with Levengood and BRC, the extension in issue did not constitute a *de facto* taking.

After hearing argument, the trial court, in an order dated July 6, 1978, determined that the averments of Berkmont's petition were sufficient to state a cause of action for a *de facto* taking. That same order directed the parties to present evidence by deposition and stipulation, to be filed of record within three months. On November 28, 1980, after they had filed depositions and exhibits, the parties entered into a written stipulation, which provided, in essence, as follows:

(1) That there was no record evidence to show that additional use of Berkmont's mains has created any additional wear and tear on those mains; and no inference was to be drawn in favor of or against either party because of the lack of such evidence.

(2) That the trial court discussed with both parties the contents of its opinion; and, after being given the opportunity to present further evidence, both parties advised the court that they did not desire to do so.

The trial court approved the stipulation and ordered it to be filed.

On March 3, 1981, the trial court entered an order dismissing the Borough's preliminary objections to the amended petition, having concluded that Berkmont had proved a right to eminent domain damages. In so deciding, the trial court determined that Berkmont had suffered an *actual* taking, rather than a *de facto* taking as the petitioner had alleged. However, the court concluded that a taking had occurred only as to some of the mains that Berkmont claimed, not all. As to the following mains, the court concluded that there was *no taking of any type:* the mains installed by Levengood and BRC in East Philadelphia Avenue; the main installed by Levengood in Montgomery Avenue; and the mains installed by BRC in 1947 in Highland Avenue and Rhoads Avenue.

From the trial court's order of March 3, 1981, the Borough filed the instant appeal.

### Discussion

The water mains which the trial court held to have been taken were: the mains that BRC installed in Rhoads Avenue in 1948, 1951 and 1953; in Douglass Street in 1953 and 1956; and in Highland Avenue in 1953 and 1954. The trial court began its reasoning by concluding that, of the foregoing mains, all of the ones installed by BRC since 1948 were but extensions of the main installed in Rhoads Avenue in 1948, and thus were governed by the 1950 agreement between

the Borough of BRC.[3] The court next determined that the 1950 agreement, unlike the 1927 and 1928 agreements, did not restrict BRC to recouping a *pro rata* share of its construction costs when an abutting landowner sought to connect to one of the mains governed by the 1950 agreement. In other words, the court construed the 1950 agreement to mean that BRC was free to set any charge it desired for a connection to the mains governed by that agreement.

Based on the above premises, that trial court concluded that BRC, and thus its successor, Berkmont, had a legally-protected veto power over the use of the capacity of the water mains governed by the 1950 agreement. The court further opined that the Borough, by installing and using its November 1976 extension, had appropriated the "excess capacity" of the mains governed by the 1950 agreement, in that the Borough was using the capacity of those mains to pump water to new customers of the Borough's water system. In the court's view, the Borough's action constituted an actual taking of property, for which Berkmont was entitled to just compensation.

The Borough, as the appellant herein, raises two arguments: (1) that no taking *of any type* has been shown by Berkmont; and (2) that Berkmont's allegation of a *de facto* taking made it improper for the trial court to base its order on a finding of *actual* taking.

With respect to what constitutes a "taking" of property, the law of eminent domain has undergone great change in recent years. There has been an expansion of the number of routes for reaching a con-

---

[3] The process by which the trial court arrived at this conclusion is not clear; however, the point has not been contested by the appellant.

clusion that property has been "taken." Certainly, a taking occurs when an entity having the power of eminent domain physically appropriates the possession or use of private property. This is what our jurisprudence has traditionally meant by the term "actual taking." *See Rosenblatt v. Pennsylvania Turnpike Commission,* 398 Pa. 111, 157 A.2d 182 (1959); *Lakewood Memorial Gardens, Inc. Appeal,* 381 Pa. 46, 112 A.2d 135 (1955). Yet, neither physical appropriation nor a formal divestiture of an owner's title are required to create a right to eminent domain damages. *Miller v. Beaver Falls,* 368 Pa. 189, 82 A.2d 34 (1951). It is now well settled that when an entity clothed with the power of eminent domain has, by even a non-appropriative act or activity, substantially deprived an owner of the beneficial use and enjoyment of his property, a taking will be deemed to have occurred. *Conroy-Prugh Glass Co. v. Commonwealth,* 456 Pa. 384, 321 A.2d 598 (1974); *Griggs v. Allegheny County,* 402 Pa. 411, 168 A.2d 123 (1961), *rev'd on other grounds,* 369 U.S. 84 (1962); *see Miller.* Such compensable circumstances have been given, rather unfortunately, the label *"de facto* taking."

Although the Eminent Domain Code provides procedures for determining just compensation when property has been taken, the Code itself does not define the term "property." Therefore, the meaning of the word "property" must be drawn from other sources of law. Frequently, the word "property" is used to describe the physical object that is the subject of ownership. However, in its precise legal sense, the word "property" denotes the aggregate of rights or legal relations that an owner has in or with respect to the physical object. *Redevelopment Authority of the City of Philadelphia v. Lieberman,* 461 Pa. 208, 336 A.2d 249 (1975).

According to common-law concepts, "property" includes the right to possess, use, enjoy and dispose of a thing. *DiGirolamo v. Apanavage,* 454 Pa. 557, 312 A.2d 382 (1973); *Willcox v. Penn Mutual Life Insurance Co.,* 357 Pa. 581, 55 A.2d 521 (1947). Also included in the bundle of rights constituting "property" is the right to exclude other persons from using the thing in question. *Loretto v. Teleprompter Manhattan CATV Corp.,* U.S. (1982);[4] *Kaiser Aetna v. United States,* 444 U.S. 164 (1979). Indeed the Supreme Court of the United States has indicated that, for eminent domain purposes, the term "property" includes "every sort of interest" an individual may possess. *United States v. General Motors Corp.,* 323 U.S. 373, 377-78 (1945).

Thus, when an entity having the power of eminent domain deprives a person of any of the legal rights or interests he has with respect to a tangible or definite thing, there is, to that extent, a taking of his property. *See Lieberman; Miller.* It is when such deprivation results from a direct appropriation of possession or use that the taking is termed "actual." When, however, a person is substantially deprived of the rights of beneficial use and enjoyment, not by direct appropriation, but as a consequence of a non-appropriative act by an entity with the power of eminent domain, the result is called a *"de facto* taking." *See, e.g., Lando v. Urban Redevelopment Authority of Pittsburgh,* 49 Pa. Commonwealth Ct. 566, 411 A.2d 1274 (1980). Therefore, to resolve the case at bar, we must first determine what legal rights or interests Berkmont had relative to the water mains here involved. Following that, we must determine whether Berkmont has been deprived of any such

---

[4] 73 L. Ed. 2d 868.

right or interest by the complained-of actions of the Borough.

Of significance to the instant case is the decision of the Pennsylvania Superior Court in *Overlook Development Co. v. Public Service Commission,* 101 Pa. Superior Ct. 217 (1931); *aff'd per curiam,* 306 Pa. 43, 158 A. 869 (1932). *Overlook* addressed the issue of what rights a land developer retained relative to a water main which the developer, at his own expense, installed in a public highway and connected to the main of a public-service water company to obtain a supply of water to the developer's land.[5] The case was an appeal by the developer's successor in interest, from a decision by the state Public Service Commission allowing a neighboring landowner to connect a water pipe to the privately installed main, and to do so without paying any compensation to the appellant. The appellant, in *Overlook,* argued that the Commission's order was confiscatory.

In the *Overlook* case, the Court began its analysis by deciding that the developer-installed main, because it had been connected with the water company's main for the service of patrons, had become a "facility" of the water company. That conclusion was based on the statutory definition of the term "facilities" in the Public Service Company Law of 1913.[6] However, the Court proceeded to advance the following principle:

---

[5] In the *Overlook* case, the main in question had actually been jointly paid for by two people. However, for the sake of convenience, we will use the unitary term "developer" in describing the facts of that case.

[6] Act of July 26, 1913, P.L. 1374, *as amended, formerly* 66 P.S. §1 *et seq.* Section 1 of this Act, 66 P.S. §1, defined the facilities of a public service company as including: "all tangible real and personal property, . . . and any and all . . . means and instrumentalities *in any manner owned, operated . . . used . . , in connection with, the business of any public service company:*" (Emphasis added)

the mere fact that the developer-installed main became a facility of the water company "did not destroy the private character of the main, nor render it subject to use by the [w]ater [c]ompany in supplying water to the public generally, or to any portion of the public as such." 101 Pa. Superior Ct. at 224. The Court then held that the main "continued to be appellant's private property *subject only to the rights therein which it granted to others by contract,* and did not become devoted to a public use." *Id.* at 225 (Emphasis added). Based on the foregoing rationale, the Court further held that the Commission's order was unlawful because it resulted in the appropriation of the use of the developer-installed main without the payment or securing of just compensation to the appellant.

We must note that in *Overlook* the agreement between the developer and the water company expressly declared that the developer-installed main should remain the property of the developer and the developer's heirs and assigns. The agreement also contained specific provisions about extensions of and connections to the main. In that regard, the agreement provided that any extension of the main required the consent of both the developer and the water company; and further provided that the developer could recover a *pro-rata* share of the original construction costs from any person desiring to extend the main. The agreement additionally provided that the developer had the exclusive permission to sell the right to connect with the main, subject, however, to the rules and regulations of the water company. *Overlook,* 101 Pa. Superior Ct. at 221.

Although the *Overlook* opinion included a holding that the developer's successor had the right to en-

force the terms of the contract, that conclusion did not negate or detract from the broader, central proposition of the case: that, absent a dedication to public use, the developer's successor retained all proprietary rights in the main except for those that had been granted away by contract. Merely because the developer's written agreement with the water company specifically addressed the developer's power to exclude others from making extensions or connections, did not mean that such a right would not have existed otherwise; nor could it mean that all other rights of ownership ceased to exist because the agreement was silent as to them.

Unlike the agreement in the *Overlook* case, the agreements that Levengood and BRC entered into with the Borough did not expressly declare that either of those developers would remain the owners of the mains they respectively installed. We conclude, however, that no contractual provision was necessary to clothe Levengood and BRC with the general ownership of those mains. In the absence of some contractual or other legal provision to the contrary, Levengood and BRC became the owners of those mains by paying for the materials from which the mains were constructed, and bearing the total cost of their installation. With respect to the Levengood-BRC mains installed in Douglass Township, the express terms of the written agreements themselves fortify the conclusion that those mains remained the property of their installers. Each of the agreements involved in this case provided that if the Levengood land in Douglass Township should be annexed into the Borough, "the main in the annexed area would become the sole property of the Borough." This clause indicates a recognition that, in the absence of

such annexation, the mains that Levengood and BRC installed in Douglass Township would remain *their* property.

Section 1501 of the present Public Utility Code, 66 Pa. C. S. §1501, provides in pertinent part that: "Any public utility service being furnished or rendered by a municipal corporation *beyond its corporate limits* shall be subject to regulation and control . . . as to service and extensions, with the same force and in like manner *as if such service were rendered by a public utility*." (Emphasis added.) Thus, because the Borough in the instant case furnishes public water service beyond its municipal boundaries, the Borough is, to that extent, subject to the jurisdiction of the state Public Utility Commission; and is, in many respects, to be treated the same as an ordinary public utility. *E.g., White Oak Borough Authority v. Pennsylvania Public Utility Commission*, 175 Pa. Superior Ct. 114, 103 A.2d 502 (1954). Section 102 of the Public Utility Code, 66 Pa. C. S. §102, defines the "facilities" of a public utility in essentially the same terms that were used in the former Public Service Company Law.[7] Consequently, by force of the *Overlook* decision, the mains installed by Levengood and by BRC in Douglass Township became, and are, facilities of the Borough's water-distribution system. That fact, however, did not negate the private character of those developer-installed mains. *Overlook.* There has been no showing that any of the Levengood-

---

[7] 66 Pa. C. S. §102 defines the "facilities" of a public utility as including: "all tangible and intangible real and personal property . . . , and any and all means and instrumentalities *in any manner owned, operated . . . used . . . in connection with, the business of any public utility*." (Emphasis added.) This definitional element was also set forth in Section 2 (10) of the Public Utility Law, Act of May 28, 1937, P.L. 1053, *as amended, formerly* 66 P.S. §1102 (10).

BRC mains were ever dedicated to public use. Accordingly, each of those mains continued to be the private property of its respective installer, and then of the installer's successors in interest, except for such rights that had been granted to others by contract.

It is undisputed that Berkmont is the successor to whatever property rights Levengood and BRC had retained as to the water mains they installed. As noted, Berkmont's petition for viewers alleged a *de facto* taking of those mains; and, in so alleging, focused on the extension the Borough made in November 1976 from the then existing terminus of the main in East Philadelphia Avenue. The first element of Berkmont's claim was that the Borough's 1976 extension constituted an unauthorized extension of Berkmont's mains, and that such deprived Berkmont of connection fees to which it was entitled. That contention, however, was not sustainable; because, the Borough's 1976 extension was not, of itself, physically attached to any main of Berkmont's. The 1976 extension was an addition to the main that the Borough had constructed in 1964, at its own expense, to bring its water system across the new Route 100. There is no basis for concluding that Berkmont had any property rights in the Borough's 1964 installation. In short, the Borough's 1976 extension was not one that would have given Berkmont a right to connection fees.

In the proceedings before the trial court, there was no competent evidence to show that the capacity of Berkmont's mains, to provide an adequate supply of water, had been or would be diminished because of the installation and use of the Borough's 1976 extension. Hence, there was no showing that Berkmont

had been deprived of the beneficial use and enjoyment of its mains as to constitute a *de facto* taking. A claim of *de facto* taking cannot be successfully based on consequences that are merely conjectural or presupposed. *Filbert Limited Partnership Appeal,* 64 Pa. Commonwealth Ct. 605, 441 A.2d 1345 (1982). As an additional matter, should the Berkmont mains suffer in their capacity to provide adequate and reasonable water service to patrons permitted to use them, the Borough would be faced not only with its duties under the water-supply contracts in this case, but also with its duties as a public utility to provide adequate and reasonable service. *See* 66 Pa. C. S. §1501.

Although we conclude that there has been no showing of a *de facto* taking in this case, we agree with the trial court's determination that Berkmont suffered an *actual* taking. Pursuant to the agreement that the Borough entered into with Levengood and BRC, the Borough's water system would gain a contractually-contemplated group of new, rate-paying patrons, while the developers bore the cost of installing the initial water mains. The first segment of this group of patrons consisted of persons who had erected or would erect houses on the Levengood tract. The second segment of the patron group consisted of the owners of land that abutted one of the privately installed mains but was not part of the Levengood tract. However, this second type of patron could not connect to any of the mains unless both the installer and the Borough consented, and unless a connection fee was paid to the installer. Except for these two contractually-contemplated groups of users, neither Levengood nor BRC relinquished the proprietary right of excluding others from *using* the mains they

installed. That right of exclusion is now vested in Berkmont.

The Borough does not challenge the trial court's finding that the mains installed by Levengood and BRC are being used by the Borough to pump water to the customers who have connected with the Borough's 1976 extension in Douglass Township. We must conclude, therefore, that the Borough has appropriated the use of Berkmont's mains, and has impressed them with a new servitude. Such action constituted an actual taking of property. The Borough, by applying Berkmont's mains to public use, has diminished the owner's right of exclusion. As the Supreme Court of the United States observed in the *Kaiser Aetna* case: the right to exclude others is one of the most essential "sticks" in the bundle of rights characterized as "property." 444 U.S. at 176. We do not suggest that the Borough, in its capacity as a public utility, may not extend its "facilities" to accommodate the public. Indeed, the Borough could be compelled to do so under certain circumstances. Our decision, like that in *Overlook,* is simply that not even a public utility may appropriate private property, without paying or securing just compensation, to serve the public or any portion thereof.

Although Berkmont stated that its claim was one for a *de facto* taking, the use of that label was not fatal to the appellee's case. Moreover, one of Berkmont's allegations was that the Borough's use of the 1976 extension had subjected Berkmont's mains *to an additional servitude.* That allegation was an assertion of an actual taking.

In our view, Berkmont has a right to just compensation with respect to each of the mains for which it initially claimed, and not just those as to which the

trial court found a taking. However, since Berkmont has not filed a cross-appeal, we must affirm the trial court's decision as it stands.

### Order

And Now, the 4th day of October, 1983, the order of the Court of Common Pleas of Berks County, entered March 3, 1981, dismissing the preliminary objections of the Borough of Boyertown, is hereby affirmed.