Morris GERMAN and Meyer
German, Appellants,

v.

The CITY OF PHILADELPHIA and
Redevelopment Authority of the
City of Philadelphia.

Commonwealth Court of Pennsylvania.

Argued June 14, 1996.

Decided Aug. 29, 1996.

Reargument Denied Nov. 4, 1996.

George Luskus, for Appellants.

Rachel H. Park, Assistant City Solicitor, for Appellee, City of Philadelphia.

Paul A. Cohen, for Appellee, Redevelopment Authority of the City of Philadelphia.

Before SMITH and FRIEDMAN, JJ., and KELTON, Senior Judge.

FRIEDMAN, Judge.

Morris German and Meyer German (Germans) appeal from an order of the Court of Common Pleas of Philadelphia County (trial court) sustaining the Preliminary Objections filed by the City of Philadelphia (City) and by the Philadelphia Redevelopment Authority (RDA) in response to the Germans' Amended Petition for Appointment of a Board of Viewers (Petition).

According to the facts as found by the trial court, the Germans own property at 920 North Marshall Street in Philadelphia. At one time, a three story building existed on the property; the first floor of the building contained a retail meat market operated by the German family, and the second and third floors were the family's residence. (S.R. at 56b–57b.) The building ceased being a residence in the early 1950s, but the Germans continued to operate the meat market there until 1963, when they relocated their business. (R.R. at 64a–65a, 70a–71a.) When they moved, the Germans took only some furniture and personal effects from the second and third floors and left the rest of the building intact. (R.R. at 78a; S.R. at 57b.) The Germans also placed a hand-made sign in the window offering the shop for sale or rent and included their address and phone numbers. (R.R. at 71a–72a.)

Since the 1950s, the City and the RDA had been redeveloping the Marshall Street area and, to that end, in 1965, the Germans deeded a small portion in the rear of their property to the RDA. (R.R. at 19a–24a, 65a–67a.) As a result of this purchase, the Board of Revision of Taxes erroneously recorded the RDA as owner of the entire property, making the property tax exempt. This error went uncorrected until 1992, when the property was returned to the tax rolls and the Germans resumed tax payments. (R.R. at 31a–33a, 80a.) Although the Germans received no real estate tax bills between 1965 and 1992, they never inquired into the matter, believing that a tax moratorium was in effect due to the disruption of the area caused by the plans for redevelopment. (R.R. at 74a–75a.)

After the Germans vacated the property in 1963, Morris German visited the site about once a month and never observed any problems with it.[1] (R.R. at 73a; S.R. at 58b.) In November or December of 1973, Morris German received a phone call from a neighboring Marshall Street merchant informing him that demolition had begun on their side of the street. The Germans did nothing at the time but, a few days later, Morris German went to the property and discovered that the building on the site had been completely demolished and its contents removed. The Germans never received any notice from the City regarding the building's demolition and never received a bill for the cost of demolition. (R.R. at 76a–77a; S.R. at 59b, 64b.)

The Germans filed their Petition on March 21, 1991,[2] pursuant to section 502(e) of the Eminent Domain Code,[3] alleging that the City and/or the RDA had effected a *de facto* condemnation of their real estate in November or December of 1973 without providing compensation.[4] On September 14, 1992, upon consideration of the Germans' Petition, the trial court issued an order appointing a Board of Viewers to determine damages. (R.R. at 3a.) The RDA and the City filed Preliminary Objections[5] which, *inter alia*, (1) asserted that the Petition failed to state a cause of action for a *de facto* taking under the Eminent Domain Code, and (2) raised the defense of a statute of limitations. The trial court then directed the parties to conduct discovery; accordingly, deposition testimony was taken from the Germans, from Robert Solvibile, Chief of Contractual Services for the City's Department of Licenses and Inspections, and from Philip Gershbach, an in-

1. Apparently, Meyer German also visited the property, but on a less frequent basis. (S.R. at 80a–81a; S.R. at 67b.)

2. The Germans originally filed a Petition for the Appointment of a Board of Viewers on August 30, 1990; this first petition was denied without prejudice to re-file upon proof of service upon the City and the RDA and proper allegations of an alleged *de facto* taking by the City and the RDA. (S.R. at 1b.) The Germans subsequently filed the Amended Petition at issue here.

3. Act of June 22, 1964, Special Sess., P.L. 84, *as amended*, 26 P.S. § 1–502(e), which provides:

> (e) If there has been a compensable injury suffered and no declaration of taking therefor has been filed, a condemnee may file a petition for the appointment of viewers substantially in the form provided for in subsection (a) of this section [detailing the requirements for such a petition], setting forth such injury.

4. The Petition alleged, *inter alia*, that:

> 5. In November or December of 1973, Morris German visited the property and discovered that the building had been razed, and the contents were gone.
> 6. [The Germans] discovered that a demolition permit had been granted to Liberty Demolition Corporation.
> 7. [The Germans] were not advised that their building was scheduled for demolition, nor did anyone notify [the Germans] of any problems or violations at the property.
> 8. A search of the records of the Philadelphia Department of Licenses and Inspections indicated that there were no violations on the premises, the property was not condemned, nor were any notices sent to the property owners.
> 9. [The Germans] believe, and therefore aver, that the City of Philadelphia and/or the Redevelopment Authority of the City of Philadelphia were involved in projects in the immediate area of the subject property.
> 10. [The Germans] believe that the property was demolished upon request by either the City of Philadelphia which mistakenly, according to the demolition permit, believed it owned the premises, or by the Philadelphia Redevelopment Authority which had been active in acquisitions in the immediate area of the subject premises.
> 11. As a result of the above actions of its agents, the City of Philadelphia and/or the Philadelphia Redevelopment Authority has effected a *de facto* condemnation of [the Germans'] property.
> 12. The City of Philadelphia and/or the Philadelphia Redevelopment Authority have failed to tender any compensation to [the Germans] for the injury and damage to their property caused by the above-mentioned actions.
> 13. Neither the City of Philadelphia nor the Philadelphia Redevelopment Authority has filed a Declaration of Taking nor a Petition for the Appointment of a Board of Viewers for the compensable injury suffered by [the Germans.]

(R.R. at 4a–6a.)

5. The RDA filed its Preliminary Objections on October 9, 1992, and the City filed its Preliminary Objections on October 19, 1992. Preliminary objections are the exclusive method under the Eminent Domain Code of raising legal and factual objections to a petition for appointment of viewers which alleges a *de facto* taking. *Holmes Protection of Pittsburgh, Inc. v. Port Authority of Allegheny County*, 90 Pa.Cmwlth. 342, 495 A.2d 630 (1985), *appeal denied*, 519 Pa. 656, 546 A.2d 60 (1988).

vestigator retained by the Germans. The City also responded to the Germans' interrogatories and request for the production of documents.

■ The trial court made its findings of fact based on this evidence and concluded that there had been neither an actual nor a *de facto* taking of the property. Further, the trial court determined that the Germans had suffered no compensable injury where the property, at the time of demolition, had been abandoned for ten years and had generated no income during that period. Finally, the trial court held that the Germans' cause of action was barred by the applicable statute of limitations. Accordingly, the trial court sustained the City's and the RDA's Preliminary Objections and dismissed the Petition. The Germans appeal from that order.[6]

■ On appeal, the Germans first argue that the trial court lacked subject matter jurisdiction over the Preliminary Objections because both the City and the RDA failed to file their Preliminary Objections within twenty days of receipt of notice of the appointment of the Board of Viewers. In support of this argument, the Germans rely on section 504 of the Eminent Domain Code, which provides in relevant part:

> Any objection to the appointment of viewers not theretofore waived may be raised *by preliminary objections filed within twenty days after receipt of notice of the appointment of viewers. Objections to the form of the petition or the appointment or the qualification of the viewers are waived unless included in preliminary objections*. The court shall determine promptly all preliminary objections and make such orders and decrees as justice shall require....

26 P.S. § 1-504 (emphasis added).

Based on this language, the Germans contend that we must reinstate the trial court's

September 14, 1992 order appointing a Board of Viewers. In response, the City and the RDA assert that the Germans have waived such an argument because they did not raise the matter before the trial court by filing preliminary objections to the Preliminary Objections filed by the City and the RDA. We agree with the City and the RDA.

In *In re Condemnation of Premises 320 Crestview Circle*, 68 Pa.Cmwlth. 506, 449 A.2d 820 (1982), the petitioners, like the Germans here, contended that the preliminary objections to an order appointing a board of viewers were untimely because they were filed beyond the twenty-day requirement of section 504 of the Eminent Domain Code, 26 P.S. § 1-504. We noted that the petitioners in *Crestview Circle*, again like the Germans here, responded to the preliminary objections by way of an answer in which they did not challenge the timeliness of the former pleading, and we determined that the petitioners failed to preserve the issue for review on appeal, stating:

> the proper manner in which to raise a challenge to the preliminary objections would have been by a preliminary objection to the preliminary objections in the form of a motion to strike for lack of conformity to law or rule of court.... Having failed to raise the matter below, the petitioners are deemed to have waived their objection to the untimeliness of DOT's pleading.

*Id.* 449 A.2d at 822. Applying *Crestview Circle* here, we conclude that the Germans' first argument must fail.

■ Next, the Germans argue that the trial court erred by finding that neither an actual nor a *de facto* taking of the subject property occurred.[7] The decision of whether

---

**6.** Where the trial court sustains preliminary objections to a petition for appointment of viewers, *our scope of review is limited to determining* whether findings are supported by competent evidence or whether the court committed an error of law. *Darlington v. County of Chester*, 147 Pa.Cmwlth. 177, 607 A.2d 315 (1992), *appeal denied*, 531 Pa. 657, 613 A.2d 562 (1992).

**7.** In their Petition, the Germans allege only a *de facto* taking of their property; however, this label

is not fatal to their case for an actual taking. *Borough of Boyertown Appeal*, 77 Pa.Cmwlth. 357, 466 A.2d 239 (1983).

An "actual" taking occurs when an entity having the power of eminent domain physically appropriates the possession or use of private property. *Id.* However, neither physical appropriation nor a formal divestiture of title are necessary to create a right to eminent domain damages for a *de facto* taking. *Department of*

a compensable taking has occurred requires an initial determination that the act complained of was, in fact, an exercise of eminent domain power. Acts not done in the exercise of the right of eminent domain and not the immediate, necessary or unavoidable consequences of such exercise cannot be the basis of a proceeding in eminent domain. *Fulmer v. White Oak Borough*, 146 Pa.Cmwlth. 473, 606 A.2d 589 (1992); *Scherbick v. Community College of Allegheny*, 53 Pa.Cmwlth. 458, 418 A.2d 791 (1980); *In re Condemnation of 2719, 21, 11 E. Berkshire Street*, 20 Pa. Cmwlth. 601, 343 A.2d 67 (1975). Having examined the facts presented here, we agree with the trial court that the evidence is insufficient to establish that either the City or the RDA demolished the building pursuant to an exercise of eminent domain power; thus, the demolition is not a compensable taking under the Eminent Domain Code.

With regard to the City, the Germans base their claim on the "Application for Building Permit" (Application), maintaining that it is evident from this document that the City performed either an actual or a *de facto* taking of the property. The Germans assert that the City, through its Department of Licenses and Inspections, processed the Application which listed the City as owner of the property and requested authorization for demolition of the property. The Germans point out that, subsequently, the German property was, in fact, demolished. We cannot agree that the Germans, through the Application, offer direct proof to show that it was the City which demolished the property or to show that, *if* the City authorized demo-

lition of the building, it did so in the exercise of its eminent domain powers.

The Application, issued to the Liberty Demolition Corporation, was the only document uncovered in response to the German's request for production of documents. The Application authorizes demolition of 920 North Marshall Street and identifies the City as owner of the property; further, in the space provided for this information, the Application indicates that the demolition was not the result of a building violation. However, only one space below this information, the Application also reveals that the demolition was necessary and, elsewhere on the Application, a stamped imprint states, "For information ... call the Health Department." (R.R. at 9a–10a; S.R. at 59b, 68b.) [8]

The trial court considered this evidence and noted that the Application stated that the demolition was necessary and referred questions to the health department. Thus, the trial court determined that the Application suggests that the building was demolished under the City's police powers rather than under its eminent domain powers, so that the demolition is not compensable under the Eminent Domain Code. *See Petition of Kenvue Development, Inc.*, 145 Pa.Cmwlth. 106, 602 A.2d 470 (1992), *appeal denied*, 531 Pa. 657, 613 A.2d 562 (1992) (stating that a municipality that acquires private property for the public good under the authority of its police powers is not required to compensate the property owner for diminution in use even though the action amounts to an actual taking or destruction of the property).

*Transportation v. Greenfield Township*, 135 Pa. Cmwlth. 113, 582 A.2d 41 (1990), *appeal denied*, 527 Pa. 669, 593 A.2d 844 (1991). In order to establish a *de facto* taking, the burden is on the property owner to show that exceptional circumstances exist which substantially deprive him of the beneficial use and enjoyment of his property. *Zettlemoyer v. Transcontinental Gas Pipeline Corp.*, 540 Pa. 337, 657 A.2d 920 (1995); *Darlington*. Further, the property owner must show that this substantial deprivation was occasioned by the actions of the entity clothed with the power of eminent domain, resulted from the exercise of that power, and that the damages sustained by the owner were the immediate, necessary and unavoidable consequence of that exercise. *Id.* The burden of proving a *de facto* taking is a heavy one, *Zettle-*

*moyer*, and each case turns on its own unique facts. *Rawls v. Central Bucks Joint School Building Authority*, 8 Pa.Cmwlth. 491, 303 A.2d 863 (1973).

8. In regard to the Application, Solvibile testified that the City's listing as the owner of the property was simply standard procedure because the City, although not actually the owner of the property, acted as the owner's agent when it authorized a demolition because a property is dangerous or structurally unsound. (R.R. at 91a, 103a.) Solvibile also asserted that, although the Application indicated that there was no building violation, that was clearly a mistake because demolition would have been impossible unless the building were in violation. (R.R. at 104a–07a.)

Alternatively, the trial court determined that the demolition might have been the result of a mistake and, thus, the Germans could not obtain recovery in an eminent domain proceeding. *Berkshire Street.* The trial court noted that the City may have checked only the tax records when processing the Application, in which case it would have discovered, mistakenly, that the RDA, not the Germans, owned the property. (*See* R.R. at 89a–91a.) Further, the trial court pointed to Solvibile's testimony in which he stated that a person obviously made a mistake on the Application by checking "no" where the Application asked if the demolition was the result of a violation. Solvibile testified that the space should have been marked "yes" in that space because an employee could not process the Application without having documentation to prove that the building was in violation. (R.R. at 106a–07a.)

The Germans argue that there is insufficient evidence to support the trial court's conclusion that the demolition of the property occurred either as a result of the exercise of the City's police powers or by mistake, rather than under the City's eminent domain powers. In fact, the Germans assert that the trial court should have found to the contrary; they argue that the trial court should have attributed an inference adverse to the City from the City's failure to produce the demolition file for the property, and based on that inference, should have concluded that the City performed a taking of the property. *See Piwoz v. Iannacone,* 406 Pa. 588, 178 A.2d 707 (1962) (holding that the failure to produce evidence which would properly be part of the case and is within the control of a party whose interest it would naturally serve, militates strongly against that party and raises, in the absence of explanation, an inference of fact that it would be unfavorable to him). We disagree. Even if an adverse inference may be drawn where evidence *available* only to one party should be, but is not, produced, that is not this case. Here, the City attempted to locate the demolition file for the Germans' property; however, because of the length of time which the Germans allowed to pass before bringing their action, the information sought was no longer *available* at all. (*See* R.R. at 88a–89a.)

Moreover, in making this argument, the Germans appear to forget that the City does not have the burden here; rather, it is the Germans who must establish that the demolition was done by the City in the lawful exercise of the City's eminent domain powers. The fact that the trial court found that the demolition *may* have occurred for other reasons underscores the fact that the Germans offered no clear, concrete evidence that the City took the property pursuant to its eminent domain powers. Accordingly, the trial court did not err in concluding that the Germans had no action against the City under the Eminent Domain Code.

The Germans also assert that the evidence demonstrates that the RDA is responsible for either an actual or a *de facto* taking of the German's property in connection with the RDA's plan to redevelop the Marshall Street area. In support of this contention, the Germans note that the records of the Board of Revision of Taxes listed the RDA as owner of the property from 1963 until 1992. Further, the Germans point out that the RDA took title to 900–918 Marshall Street, encompassing all properties to the south of the subject property, and that the RDA deeded these same properties to the Philadelphia Suburban Redevelopment Corporation. (See R.R. at 34a–57a.) These facts, the Germans argue, lead inexorably to the conclusion that the RDA took the property. We cannot agree.

Again, the Germans have submitted no evidence to link the actions of the RDA with the demolition. Rather, the only evidence offered by the Germans that the RDA was the direct and necessary cause of the demolition was the Germans' conjecture that, because the RDA had been active in redeveloping the area, they must have taken the property. However, Morris German himself testified that, with the exception of the small portion of the rear of the property which the RDA purchased for redevelopment purposes in 1965, the remainder of the property was slated to remain untouched by the redevelopment. (R.R. at 66a–67a.) Moreover, as the trial court points out, the Application which the Germans use to support their case

lists the City as owner of the property, and Solvible, in his testimony, stated that if the RDA had ordered the demolition, the Application would have been made out in its name. (R.R. at 103a.) Therefore, based on the evidence presented, the trial court did not err in concluding that the Germans failed to meet their burden of proving that the RDA took the subject property pursuant to its eminent domain powers.

Further, contrary to the Germans' argument, we conclude that the trial court properly determined that the Germans failed to prove that they suffered a compensable injury as required under section 501(e) of the Eminent Domain Code, 26 P.S. § 1–501(e). The trial court based its determination on the fact that the Germans had abandoned the property ten years prior to the demolition and had received no income from and made no investment in the property during that time. The Germans concede that they had not used the building for many years before it was torn down; however, they contend that, as owners, they could have chosen to rent, sell or use the premises at any time. The Germans maintain that they suffered a compensable injury when they lost that option due to the demolition of the building. However, considering the length of time between the abandonment of the building and its demolition, we believe that the trial court's position is justified.[9]

■ Finally, the Germans assert that the trial court erred by finding that the Germans' cause of action was time-barred. Based on their contention that a taking clearly occurred, the Germans maintain that their action was timely because it was governed by 42 Pa.C.S. § 5530(a)(3), which provides a twenty-one year statute of limitations for proceedings "in inverse condemnation, if property has been taken and the condemnor has not made payment." However, as previ-

ously discussed, the Germans have not satisfied their burden of establishing that a taking occurred here; thus, the twenty-one year statute of limitations is inapplicable.[10]

For these reasons, we affirm the trial court's order sustaining the Preliminary Objections and dismissing the Germans' Petition.

### ORDER

AND NOW, this 29th day of August, 1996, the order of the Court of Common Pleas of Philadelphia County, dated September 13, 1995, is hereby affirmed.

---

**9.** The Germans' claim that they anticipated future benefit from the building seems particularly disingenuous in light of the fact that, shortly after the Germans vacated their shop, they did, in fact, have another butcher use the property for his business on a temporary basis; however, the Germans collected no rents during this period and made no effort to collect unpaid rents. (R.R. at 72a.)

**10.** This is not to say that the Germans were without recourse when their property was demolished; however, because they did not timely file a proper cause of action, but, instead, belatedly sought compensation for their loss by filing an action under the Eminent Domain Code, the Germans' efforts cannot succeed.