**YORK CITY REDEVELOPMENT AUTHORITY OF the CITY OF YORK**

v.

**OHIO BLENDERS, INC., Appellant.**

Commonwealth Court of Pennsylvania.

Argued June 11, 2008.

Decided Sept. 8, 2008.

---

**1054**

Rees Griffiths and Eric Suter, York, for appellant.

Donald B. Hoyt, York, for appellee.

OPINION BY Judge McGINLEY.

Ohio Blenders, Inc. appeals from the order of the Court of Common Pleas of York County (trial court) which overruled its Preliminary Objections to the Redevelopment Authority of the City of York's (RDA) Amended Declaration of Taking.

In June 2005, the York City Planning Commission (YCPC) identified an area commonly known as the "Northwest Triangle" (NWT) as blighted due to the existence of economically or socially undesirable land use. In July 2005, the YCPC reviewed and adopted the NWT Blight Certification. In December 2005, the YCPC adopted a Redevelopment Plan for the NWT.

Ohio Blenders, Inc., a dehydrated alfalfa processing company, owns 2.85–acre property (Property) which is located within the Blight Certification.

To fund the NWT Project the RDA applied for and was awarded $7 million in grant funds from the Redevelopment Assistance Capital Program (RACP) for the renovation and construction of the NWT project.[1] On March 1, 2006, RDA's Con-

1. Under the Capital Facilities Debt Enabling Act ("CFDEA"), Act of February 9, 1999, P.L. 1, 72 P.S. §§ 3919.101–3919.5102, the Commonwealth of Pennsylvania is authorized to make Redevelopment Assistance Capital Grants for large economic development projects in the Commonwealth. The CFDEA authorizes and provides procedures for application to the Commonwealth by municipalities and municipal authorities for state funding of certain capital projects. It authorizes the Commonwealth to undertake debt by issuing general obligation bonds for the purpose of making grants to local authorities for the construction, repair, renovation, improvement or equipment of qualifying capital projects.

The Redevelopment Assistance Capital Program provides financial assistance in the form of reimbursement from the Commonwealth for an applicant's project. Expenses are paid by the grantee before they are submitted to the Commonwealth for reimbursement. A

sultant to the NWT Project, David Carver (Carver), offered, on behalf of the RDA, to pay Ohio Blenders $2 million for its Property.

Kenneth Vaupel (Vaupel), CEO of Ohio Blenders offered to sell the Property for $2.6 million. The RDA rejected the offer and Vaupel reduced his offer to $2.3 million which the RDA also rejected. On May 10, 2006, the RDA withdrew its original $2 million offer.

On May 12, 2006, the RDA filed a Declaration of Taking by eminent domain. Ohio Blenders filed preliminary objections. The RDA filed an Amended Declaration of Taking on August 30, 2006, which cured a technical defect in its first filed Declaration of Taking. The RDA's Amended Declaration of Taking was accompanied by a bond, executed by the RDA, which provided "security for the payment of such damages as shall be determined by law for said condemnation":

> WHEREAS, the Redevelopment Authority of the City of York [RDA] desires to file its bond as security for the payment of such damages as shall be determined by law for said condemnation;
>
> NOW, KNOW ALL MEN BY THESE PRESENTS, that the said Redevelopment Authority of the City of York [RDA] is held and firmly bound unto the Commonwealth of Pennsylvania for the use of Ohio Blenders, Inc., the Condemnee, for damages to be paid to the said Ohio Blenders, Inc., its successors and assigns to which payment well and truly to be made, the said Redevelopment Authority of the City of York [RDA] binds itself, its successors and assigns, firmly by these presents.

Bond of the Redevelopment Authority of the City of York, May 12, 2006, at 1; Reproduced Record (R.R.) at 15.

On September 27, 2006, Ohio Blenders filed Preliminary Objections to the Amended Declaration of Taking.

Ohio Blenders argued that the RDA failed to provide adequate security for the taking prior to September 1, 2006, the effective date of the new Eminent Domain Code (new Act), particularly the provisions of the Property Rights Protection Act (PRPA).[2] It asserted that the RDA's "open bond" was not guaranteed by a surety, therefore, it did not legally satisfy the required just compensation. Ohio Blenders asserted that as a result, the RDA's commencement of these proceedings did not constitute an "exercise of the power of eminent domain" on or after the

---

"drawdown" procedure is used to assure the Commonwealth has appropriate cash flow for the RACP, that the grantee is contributing an appropriate share of funds to the project and RACP funds are being used for appropriate expenses. *See* Office of Budget's RACP website at www.budget.state.pa.us.

The NWT project was eligible to receive funding via the legislative authorization in the Capital Budget Project Itemization Act for 2004 (Act 40). In September of 2006, Governor Rendell authorized the release of $7 million in Redevelopment Assistance Capital Program funds for the renovation and construction of the NWT project.

**2.** Act of May 4, 2006, P.L. 112, 26 Pa.C.S. §§ 201–207. The Historical and Statutory

Notes to Section 1 of the PRPA, 26 Pa.C.S. § 201, provide that the PRPA became effective "in 120 days," on September 1, 2006.

With enumerated exceptions, the PRPA limits the use of eminent domain by prohibiting any condemnor to take property in order to use it for private enterprise:

§ 204. **Eminent domain for private business prohibited**

(a) **Prohibition.**—Except as set forth in subsection (b), the exercise by any condemnor of the power of eminent domain to take private property in order to use it for private enterprise is prohibited.

26 Pa.C.S. § 204.

effective date of the PRPA. According to Ohio Blenders, the mere filing of a Declaration of Taking was not tantamount to "exercising the power of eminent domain." It argued that the "exercise of the power of eminent domain" required that constitutionally sufficient security first be given. Because the RDA did not provide sufficient security prior to September 1, 2006, the RDA did not "exercise the power of eminent domain" in time to avoid the provisions of the PRPA.

Finally, Ohio Blenders took issue with the RDA's Blight Certification and asserted that it was undertaken in bad faith. Specifically, Ohio Blenders challenged the Blight Certification's underlying data on the basis that it was fabricated. It also asserted that the RDA undertook negotiations to buy the Property in bad faith because it internally valued the property at $2.4 million dollars, yet it withdrew the $2 million dollar offer.

Following oral argument and hearings, the trial court overruled Ohio Blenders' PRPA-based preliminary objection. The trial court held that the "condemnation was effected by the filing of the Amended Declaration of Taking on August 30, 2006, prior to the September 1, 2006, effective date of the revised Eminent Domain Code and the [PRPA]. Accordingly, the revised Eminent Domain Code and the [PRPA] are inapplicable to the instant condemnation proceeding." Trial Court Order Denying In Part Preliminary Objections of Defendant Ohio Blenders, Inc., July 17, 2007, at 2.

On the issue of the bond's sufficiency, by order dated November 13, 2007, the trial court determined that the RDA's "open bond" did not provide sufficient security for the Declaration of Taking.[3] The trial court directed the RDA to:

Reserve one million, two hundred thousand dollars ($1,200,000), available through RACP grant funds [Capital Assistance Program funds] to be dedicated to fund the taking of Ohio Blenders' property, and considering additional issues regarding valuation of the property, the Court directs that an additional bond backed by third party surety be established by the Condemnor, Redevelopment Authority for the City of York, for the Condemnee, Ohio Blenders' property in the amount of one million eight hundred thousand dollars ($1,800,-000), to further ensure that Ohio Blenders receives just compensation for the taking of its property, in the event an affirmative award is rendered. The bond and reserved funds totaling three million dollars ($3,000,000) shall remain in effect for as long as the Condemnor maintains the instant action.

Trial Court Order, November 13, 2007, at 1–2.

On December 12, 2007, the trial court held a conference in chambers on RDA's motion to modify the surety bond requirement. At the conclusion of that conference the trial court directed the RDA to provide assurances regarding Ohio Blenders' priority in the $1.2 million reserved RACP funds. Specifically, the trial court's order stated:

We have met with counsel and it appears that the bond in question which the Court had sought, the $1.8 million bond, will be covered by a third-party insurer.

And the Court has requested counsel for the Redevelopment Authority to confer with PeoplesBank to assure validity of the Court's request to set aside and reserve $1.2 million in the RACP grant

---

**3.** The record reflects the RDA's appraiser valued the Property at less than $1 million while Ohio Blenders' appraiser valued the Property at $3 million.

funds giving priority to the Ohio Blenders' project for that $1.2 million.

Trial Court Order, December 18, 2007 at 1.

On December 20, 2007, the RDA provided the trial court and Ohio Blenders with a copy of a $1.8 million Surety Bond. The Bond stated "this Surety Bond is in excess of and in addition to the $1,200,000.00 in RACP grant funds that said Principal has already reserved for the purchase of the Obligee's property." Surety Bond, December 14, 2007, at 1; R.R. at 417. The Surety Bond further declared that "the condition of this obligation is such that if the Principal shall pay an affirmative award rendered in favor of Obligee that is in excess of $1,200,000.00 then ... then this obligation shall be null and void." Surety Bond, December 14, 2007, at 1; R.R. at 417.

At the same time it provided a copy of the Surety Bond, the RDA provided the trial court and Ohio Blenders with a letter sent from Harry R. Swift (Mr. Swift), General Counsel to PeoplesBank, to Donald B. Hoyt, Esquire, RDA's counsel. In his letter Mr. Swift acknowledged the continuation of PeoplesBank's first priority lien against all RACP funds. He also stated that "currently, more than $1.2 million is available under the Line [of Credit], and there is no prohibition to the RDA's use of these funds to acquire the Ohio Blenders' property." Letter from Harry Swift to Donald B. Hoyt, Esquire, December 20, 2007, at 1; R.R. at 416.

Finally, on November 21, 2007, the RDA adopted Resolution 4455 "to reserve and set aside One Million Two Hundred Thousand ($1,200,000) Dollars from the RACP Grant funds and dedicated for the taking of the Ohio Blenders' property." Resolution No. 4455 of Redevelopment Authority of the City of York, November 21, 2007, at 1; R.R. at 481.

The trial court held in its January 31, 2008, Order that the RDA complied with its December 12, 2007, order.

Following argument and a hearing, the trial court on January 31, 2008, overruled Ohio Blenders' preliminary objection which asserted bad faith in the underlying Blight Certification process.

On appeal to this Court[4], Ohio Blenders argues that the trial court misconstrued the PRPA which mandated dismissal of the action because the RDA failed to "exercise the power of eminent domain" on or before September 1, 2006, the effective date of the PRPA. Because the RDA did not post the required security for its taking on or before the PRPA's effective date, it did not timely "exercise" the power of eminent domain to avoid application of the PRPA.

In its second issue, Ohio Blenders contends that the RDA failed to secure just compensation. It maintains that RDA's mere promise to draw credit, the availability of which was subject to the discretion of PeoplesBank, did not constitute legally sufficient security for just compensation.

Third, Ohio Blenders asserts that the RDA failed to rebut its *prima facie* case of bad faith. According to Ohio Blenders, the trial court found that Ohio Blenders

---

4. In eminent domain cases this Court's scope of review is limited to a determination of whether the trial court committed an abuse of discretion or an error of law. *E–V Company Appeal*, 117 Pa.Cmwlth. 475, 544 A.2d 87, 88 (1988). Furthermore, this Court's review of an Urban Redevelopment Law, Act of May 24, 1945, P.L. 991, 35 P.S. §§ 1702–1747, condemnation case is whether the authority has acted in bad faith or arbitrarily, if it has followed the mandated statutory procedures in preparing a Redevelopment Plan, and whether there was a constitutional violation. *Crawford v. Redevelopment Authority of the County of Fayette*, 418 Pa. 549, 552, 211 A.2d 866, 868 (1965).

made out a *prima facie* case of bad faith but then failed to shift the burden to the RDA to support the Blight Certification. Ohio Blenders contends that the trial court erroneously concluded that it failed to produce evidence that established that the RDA acted in bad faith.

### 1. Did the RDA "exercise the power of Eminent domain" prior to September 1, 2006?

The Historical and Statutory Notes which accompany Section 203 of the PRPA, 26 Pa.C.S. § 203, state:

Section 3 of 2006, May 4, P.L. 148, No. 35, effective in 120 days [September 1, 2006], provides:

(a) *This act [PRPA] shall apply to the exercise of the power of eminent domain on or after the effective date of this section* [September 1, 2006]. (Emphasis added).

Ohio Blenders asserts that the PRPA, which prohibits takings for private enterprise, applies to this action because the RDA failed to "exercise the power of eminent domain" on or before the effective date of the PRPA. Ohio Blenders argues that a condemnor cannot *constitutionally* "exercise" its power of eminent domain unless or until it has (1) filed the declaration of taking; *and* (2) posted legally sufficient security. Ohio Blenders maintains that a *constitutional* "exercise of the power of eminent domain" does not occur without validation *via* a court-approved bond (or, if not challenged, an uncontested bond) that the condemnor is financially able to pay just compensation.[5] In other words, it asserts that in a controversy such as this, where the sufficiency of the bond is challenged, an "exercise" of eminent domain power does not occur until the proffered security is approved by the trial court.

The phrase "the exercise of the power of eminent domain" may be interpreted differently depending on how the word "exercise" is construed. The word "exercise" has different commonly understood meanings depending on the context in which it appears. "Exercise" is defined by Black's Law Dictionary as:

**Exercise,** *vb.* 1. To make use of; to put into action <exercise the right to vote>. 2. To implement the terms of; to execute <exercise the option to buy the commodities>—**exercise, n.**

Black's Law Dictionary, 594 (7th ed.1999).

As the Black's definition indicates, "exercise" refers to the positive act of making use of, putting into action, implementing the terms of, executing.

Ohio Blenders interprets the phrase "the exercise of the power of eminent domain" as though the General Assembly intended the word exercise to refer to something that has already been lawfully completed and accomplished, a *fait accompli*. This facilitates an argument that the constitutional requirements necessary to lawfully "effect" a condemnation were not met; that there can be no *definitive* or perfected "exercise" of the power of eminent domain without posting sufficient security. The problem this Court has with Ohio Blenders' interpretation is that it assumes the word "exercise" means the criteria for a "constitutional exercise" has been met when a simple reading of what precedes the language fails to disclose any words which indicate that this is what the General Assembly intended.

Both Article I, Section 10 of the Pennsylvania Constitution and the Fifth and Fourteenth Amendments to the United

---

**5.** Of course a condemnor possessing the power of taxation is exempt from posting security. For example, cities are not required to give bond for security and their taxing power or pledge of tax revenues is adequate security for damages. 26 Pa.C.S. § 303(b).

States Constitution prohibit taking property without paying just compensation. Ohio Blenders is, therefore, initially correct when it asserts that in order to constitutionally accomplish or "effect" a *de jure* condemnation, the condemning authority must (1) file a declaration of taking, and (2) make or secure just compensation. Section 402 of the Eminent Domain Code, 26 P.S. § 1–402 [6] provides:

§ 1–402. Declaration of Taking

(a) Condemnation and passage of title.—(1) *Condemnation* under the power of condemnation given by law to a condemnor ... *shall be effected only by the filing in court of a declaration of taking, with such security required* under section 303(a) (relating to security required).

■ This Court, however, does not agree that the phrase "the exercise of the power of eminent domain," *as used in this context,* refers to the eventual outcome of a lawful exercise of that power. An "actual taking" is defined as that which occurs "when an entity having the power of eminent domain physically appropriates the possession or use of private property." *Borough of Boyertown Appeal,* 77 Pa. Cmwlth. 357, 466 A.2d 239, 245 (1983). An actual taking is not accomplished or completed until the trial court approves the authority's bond. While posting adequate security is a prerequisite to constitutionally "effect" a condemnation and is determinative of when title passes and when the

condemning authority obtains the right to possession, it is not a prerequisite to an "exercise" of the power of eminent domain. Therefore, this Court does not concur that there is no "exercise" of power until after the disposition of preliminary objections and a decision is entered regarding the sufficiency of the security posted.

This Court believes that the General Assembly intended that the phrase "the exercise of the power of the power of eminent domain" in this context, refers to the event which marks the condemnor's wield or exertion of its power in accordance with the procedures authorized by Article IV of the Eminent Domain Code. Here, the RDA "exercised" its power of eminent domain when it initiated the *de jure* condemnation by filing its **original** Declaration of Taking together with a document entitled "Bond of the Redevelopment Authority of the City of York" on May 12, 2006.

The fact that the trial court found the security posted by the RDA to be insufficient did not mean that the RDA did not "exercise" its power of eminent domain. The Eminent Domain Code, which governs whether, when and how a condemning authority may exercise the power of eminent domain, expressly authorizes the posting of a bond "without surety." Section 403, 26 P.S. § 1–403.[7] A condemnee may challenge the sufficiency of the bond by filing preliminary objections. *See* Section 403 of the Eminent Domain Code, 26 P.S. § 1–

---

**6.** The former Eminent Domain Code, Act of June 22, 1964, Special Session, P.L. 84, *as amended,* 26 P.S. § 1–402 was repealed by Section 5 of the Act of May 4, 2006, P.L. 112. Because of the dates involved in this action, the former version of the Eminent Domain Code applies.

**7.** Section 403(a) of the Eminent Domain Code, 26 P.S. § 1–403(a) defines the "Security Required" as:

§ 1–403. Security Required

(a) Bond. Except as hereinafter provided, every condemnor shall give security to effect the condemnation by filing with the declaration of taking its bond, *without surety,* to the Commonwealth of Pennsylvania for the use of the owner or owners of the property interests condemned, *the condition of which shall be that the condemnor shall pay such damages as shall be determined by law.*

This Court notes that the Bond filed with the RDA's original and Amended Declaration of

403(c). And the trial court may require the condemnor to give such bond and security as the court deems proper if it appears to the court that the bond or power of taxation of the condemnor is not sufficient security. *Id.* Indeed, it was the very "exercise" of eminent domain, *via* the initiation of condemnation proceedings by the filing of the Declaration of Taking and Bond, which triggered the limitations and protections of the Eminent Domain Code and provided Ohio Blenders recourse to a comprehensive procedure to challenge the taking.

This Court concludes that, in a condemnation case such as this which involves a

---

Taking technically satisfied the preliminary requirements of this section since it bound the RDA to pay damages to Ohio Blenders and that bond was security "for the payment of such damages as shall be determined by law."

8. Moreover, this Court believes that subsection (b) of the Historical and Statutory Notes further precludes application of the PRPA and warrants discussion even though it was not addressed by Ohio Blenders. The Historical and Statutory Notes which accompany Section 203 of the PRPA, 26 Pa.C.S. § 203, state, in pertinent part:

Section 3 of 2006, May 4, P.L. 148, No. 35, effective in 120 days [September 1, 2006], provides:

\* \* \*

(b) *For property acquired pursuant to 26 Pa.C.S. § 205* [relating to blight], *this act [PRPA] shall not apply to units of property identified in a redevelopment proposal approved by a governing body before the effective date of this section.*

Ohio Blenders contends that the PRPA permits eminent domain to be used for the purpose of taking blighted property only if that property is truly blighted, i.e., blighted according to specific criteria enumerated in the PRPA. Clearly, based on this language, the PRPA does not apply to units of property identified as blighted *before* the effective date of the PRPA. Here, Ohio Blenders stipulated that:

4. In December 2005, the YCPC made a Redevelopment Plan for the NWT [hereinafter Plan]. . . .

---

*de jure* taking, the legislature intended that an exercise of the power of Eminent Domain to occur when a condemnor files a Declaration of Taking accompanied by the security authorized in Section 403, 26 P.S. § 1–403.[8]

Because the RDA filed a Declaration of Taking and Bond pursuant to Section 402, 26 P.S. § 1–402, before the effective date of the PRPA, the PRPA does not apply.

### 2. Was the Security Approved by the Trial Court Sufficient to Secure Just Compensation?

Ohio Blenders asserts that the $1.2 million Line of Credit from PeoplesBank re-

---

5. The Plan specifically dealt with the area West of George Street which is known as the NWT.
6. On December 12, 2005, the YCPC adopted the Plan.
7. On December 19, 2005, the YCPC reviewed a Redevelopment Proposal [hereinafter the Proposal] submitted by the Redevelopment Authority of the City of York [hereinafter RDA] for certain redevelopment activities needed to begin implementation of the Northwest Triangle Redevelopment Project, a portion of the larger Northwest Triangle Redevelopment Area and on December 30, 2005, a Report and Recommendation was prepared by Genevieve Ray, Chairman YCPC.
8. On January 9, 2006, the YCPC unanimously endorsed the Report and Recommendation which was then presented to the Council of the City of York.
9. The Ohio Blenders, Inc. property located on north Beaver Street at North Pershing Avenue is within the area YCPC deemed to be blighted.
10. On January 17, 2006, the City Council approved the Proposal with recommended modifications.

Joint Stipulation of the Parties, November 2, 2007, Paragraphs 4–10, at 1–2.

Accordingly, the PRPA does not apply to this controversy because Ohio Blenders' Property was identified in a redevelopment plan approved by the Council of the City of York prior to September 1, 2006, the effective date of the PRPA.

mains insufficient to support a taking of private property because the first $1.2 million consisted solely of RDA's "promise" to draw down a line of credit. Ohio Blenders also complains that PeoplesBank, particularly, the letter from Mr. Swift, provided no assurance that the bank unconditionally agreed to release the $1.2 million upon RDA's request for disbursement. Finally, Ohio Blenders asserts the $1.8 million Surety Bond was an "excess bond" making the Western Surety Company liable only if the RDA was successful in drawing down the first $1.2 million from the PeoplesBank Line of Credit.

■ It is well settled that the trial court must hold money or a bond deposited pursuant to the Eminent Domain Code to secure the payment of the damages that may be awarded against the condemnor. The judgment of the trial court as to the amount of the security will be disturbed only where there is a manifest abuse of discretion. *In Re City of Scranton*, 132 Pa.Cmwlth. 175, 572 A.2d 250 (1990).

■ In *In Re Franklin Town Project Philadelphia*, 19 Pa.Cmwlth. 272, 339 A.2d 885 (1975), this Court held that objections to security pursuant to Section 406(a) of the Eminent Domain Code must, of necessity, go to *sufficiency* of the security and not to the *form*. The incisive inquiry for the trial court is whether the security posted is (1) readily accessible, and (2) sufficient, in a quantifiable sense, to satisfy the condemnation damages. Our courts have routinely undertaken a sensible approach, with the objective being to evaluate the proposed security and the financial status of the condemnor, to assure that those funds will be available for disbursement.

At first blush, Ohio Blenders' argument appears persuasive. However, when scrutinized, this Court must conclude that Ohio Blender's objection was essentially a challenge to the *form* rather than the sufficien-

cy of the security. Although the security pledged by the RDA was not in a conventional form, when evaluated in terms of whether it was (1) readily accessible and (2) sufficient to meet the potential condemnation damages, there is no doubt that the security pledged passed muster.

Ohio Blenders argues that the $1.2 million Line of Credit was, in reality, not readily accessible because access to those funds depended upon PeoplesBank's "agreement" to release the funds. This Court does not agree that the funds were as "unavailable" or "tentative" as Ohio Blenders contends.

In the Letter of Commitment dated October 30, 2006, PeoplesBank extended the RDA a $5,500,000 non-revolving Line of Credit for the purpose of acquiring properties within the NWT. Commitment Letter from PeoplesBank to RDA, October 30, 2006, at 1. The RDA used the Line of Credit as working capital for the project. According to Mr. Swift's letter, "currently, more than $1.2 million is available under the Line [of Credit], and there is no prohibition to the RDA's use of these funds to acquire the Ohio Blenders' property." The record also demonstrated that PeoplesBank regularly had business dealings with the RDA and systematically released funds for the RDA to acquire the other properties in the NWT. Mr. Swift further confirmed to the trial court's satisfaction that more than $1.2 million was available under the Line of Credit to acquire the Ohio Blenders property. There is absolutely nothing in the record to suggest that PeoplesBank would not continue to release those funds upon the RDA's request as it had done in the regular course of business up to that time.

■ This Court, therefore, must agree with the trial court that the Commitment Letter extending the Line of Credit to the

RDA and Mr. Swift's reassurance that there was $1.2 million available under the Line of Credit was sufficient to secure $1.2 million in just compensation for purpose of the preliminary objection.[9]

This Court is also not persuaded that the RDA's immediate access to the RACP grant funds was in any way diminished by PeoplesBank's assignment of and a first lien perfected security interest in the RACP funds. Again, the $7,000,000 in RACP grant funds made it possible for the RDA to secure the $5,550,000 Line of Credit from PeoplesBank which it used as working capital to acquire properties in the NWT. The RACP funds were officially earmarked for the NWT Project and essentially a legally binding pledge to the RDA of the full faith and credit of the Commonwealth to guarantee funding. Further still, the RDA adopted Resolution 4455 to reserve and set aside $1,200,000 from the RACP grant funds dedicated for the taking of the Ohio Blender's property. This Court finds no fault with the trial court's acceptance of the RDA's position that the $1.2 million was readily available for the condemnation of Ohio Blenders' Property.

Finally, the trial court was not required to reject the $1.8 million corporate surety "excess bond" based on its form. An excess surety bond is an entirely acceptable form of security which merely limits the liability of the surety to the amount exceeding other available sources of funds. Here, the $1.8 million Surety Bond was available after the expenditure of the first $1.2 million, so that the total amount available to the RDA for the condemnation was $3 million, the precise amount of Ohio Blenders' appraisal. As set forth above, the $1.2 million was available to the RDA.

The additional $1.8 million was available to the extent that the damages exceeded the first $1.2 million pledged.

Because there was sufficient evidence to support the trial court's conclusion that the RDA had the ability to pay an award of just compensation, this Court discerns no error.

### 3. Whether Ohio Blenders Established a Prima Facie Case of Bad Faith?

In its third assignment of error Ohio Blenders contends that the trial court determined that a *prima facie* case of bad faith was established. It contends that the trial court then failed to shift the burden to the RDA to support the Certification of Blight.

It is important initially that this Court notes that the trial court did not, as Ohio Blenders alleges, determine that Ohio Blenders established a *prima facie* case of bad faith. The language relied on by Ohio Blenders appears in the trial court's September 10, 2007, order in which the court stated "[t]he Court, as previously noted in its earlier opinion, [referring to the July 17, 2007 opinion] considered that *a prima facie issue has been raised* surrounding the bad faith, it is the burden of the objector [Ohio Blenders] to satisfy the Court by a preponderance of the evidence, and hence, the Court has set aside a hearing date which will be more fully set forth hereafter to consider that issue." Trial Court Order, September 10, 2007, at 1 (Emphasis added). The trial court did not make a determination that Ohio Blenders established a *prima facie* case of bad faith. To the contrary, it is clear that the trial court determined that Ohio Blenders' allegations of bad faith were sufficient to command an evidentiary hearing on the mer-

---

**9.** Previously, this Court has found that a letter of commitment pledged as security was "sufficient" because "practicality dictates [that] such a letter is highly liquid and provides easy access to the funds committed by the letter." *Franklin Town Project*, 339 A.2d at 892.

its, and it required Ohio Blenders to prove bad faith at the impending hearing.

The elimination of a certified blighted area constitutes a proper public purpose for which the power of eminent domain may be exercised. The legislative findings and declaration of policy regarding blighted areas are set forth in Section 2 of the Urban Redevelopment Law, 35 P.S. § 1702.

■ The scope of judicial review of Urban Redevelopment Law condemnation controversies includes a determination whether (1) the redevelopment authority has acted in bad faith or arbitrarily, (2) the redevelopment authority has followed the statutory procedure in preparing a redevelopment plan, and (3) there are constitutional violations. *Matter of Condemnation by Urban Redevelopment Authority,* 117 Pa.Cmwlth. 475, 544 A.2d 87 (1988). Absent proof of bad faith, fraud, abuse of discretion or arbitrary of capricious action on the part of the certifying authority, the court may not substitute its discretion for that of the public body on the subject of certification of blight. *Id.*

■ When the certification of blight is challenged by preliminary objections to the declaration of taking, the burden of proving bad faith is on the condemnee. The burden of proving fraud or abuse of discretion on the part of a planning commission is a heavy one. *Redevelopment Authority of the City of Scranton v. Kameroski,* 151 Pa.Cmwlth. 345, 616 A.2d 1102 (1992). A redevelopment authority and a planning commission are presumed to have acted in good faith in making such a determination. *Simco Stores, Inc. v. Redevelopment Authority of the City of Philadelphia,* 455 Pa. 438, 317 A.2d 610 (1974).

■ Bad faith implies tainted motive or interest, and it becomes palpable when such motive is obvious or unambigu-

ously perceived. *Redevelopment Authority of the City of Erie v. Owners of Interest,* 1 Pa.Cmwlth. 378, 274 A.2d 244, 247 (1971). Bad faith must be described by clear averments of facts in the pleadings and proved by clear, precise and indubitable evidence. *In re: Condemnation by Redevelopment Authority of City of Lancaster of Real Estate in City of Lancaster,* 682 A.2d 1369 (Pa.Cmwlth.1996). Such evidence being by credible witnesses testifying with detail to distinctively remembered facts. *In re: Condemnation by City of Philadelphia of Leasehold of Airportels, Inc.,* 40 Pa. Cmwlth. 409, 398 A.2d 224, 226 (1979).

Here, Ohio Blenders focused on the disparities between the various drafts of the Blight Certification. It claimed that the inconsistent explanations for certifying the area as blighted proved the data was fabricated and the Blight Certification was result-oriented. Specifically, (1) the first draft dated December 6, 2004, declared blight on the dual basis of "faulty street and lot layout" and "economically and socially undesirable land use." Blight Certification—Northwest Triangle Draft, December 6, 2004, at 2; R.R. at 519; (2) the second draft dated May 9, 2005, cited "the economically or socially undesirable land use" as the basis for its blight certification; Blight Certification for the Northwest Triangle, May 9, 2005, at 2; R.R. at 526; and (3) the final June 2005 draft was premised on the YCPC's desire to increase jobs and tax revenues by putting Ohio Blenders' Property to a use other than the current one. Blight Certification for the Northwest Triangle, June 2005, at 5; R.R. at 5.

■ Ohio Blenders also disputed the final Blight Certification because: (1) it did not provide documentation or support for its conclusion that the number of jobs and taxes in the NWT was lackluster, and (2) and the area considered to be blighted had increased from 19.94 acres in Decem-

ber 2004 to 42.5 acres in the final June 2005 draft. It was Ohio Blenders' theory that the YCPC manipulated the numbers when it included within the blighted area a completely separate redevelopment plan which involved a condemnation for a ballpark. By including an entirely independent, unproductive and vacant area, the YCPC radically skewed the jobs and tax revenue numbers because the YCPC compared the numbers on a per acre basis in order to determine that the NWT was nonproductive in terms of jobs and tax revenues.

After the evidentiary hearing, the trial court appropriately looked to the law and explained why, in a detailed and thorough opinion, Ohio Blenders failed to meet its heavy burden of overcoming the presumption that the YCPC acted in good faith. Trial Court Order, January 31, 2008, at 12.

The trial court comprehensively evaluated the YCPC's blight certification process in light of Ohio Blenders' allegation that the YCPC based its determination of blight on manipulated and fabricated data. The trial court accepted the explanations of the individuals who researched and compiled the data that the information was obtained through phone calls made to business owners and 2004 City Taxes provided by the Office of City Treasurer. The trial court also accepted as credible the testimony of Genevieve Ray, a member of the YCPC at the time, that there was a great deal of discussion about the blight certification process before the YCPC adopted the final blight certification. Based on the trial court's credibility determinations and acceptance of the RDA's evidence, the trial court properly concluded that Ohio Blenders, in turn, failed to provide "any contrary assertions of information or any substantial proof that the data was manipulated or fabricat-

ed." Trial Court Order, January 31, 2008, at 9.

Regarding the alleged discrepancies between the various drafts, the trial court concluded that regardless of the fact that earlier drafts may have referenced different reasons for the certification of blight, "[f]rom the start of the blight certification process, beginning with the 2004 draft of blight certification, the socially or economically undesirable land use was addressed as a basis for blight in the NWT." Trial Court Order, January 31, 2008, at 9. This Court has reviewed the drafts and agrees with the trial court's assessment. The mere fact that there were multiple drafts involved in the Blight Certification process did not in any way indicate fraud or manipulation. Variations in or changes between the various drafts of the Blight Certifications did not necessarily, as Ohio Blenders contends, establish fraud or bad faith. Rather, a draft exists as a preliminary document, subject to revision. Subsequent changes reflect the normal process of revising and refining initial theories and assumptions in preliminary drafts.

Finally, the trial court found that the expansion of the blighted area to include 42.5 acres did not expose a tainted motive. Ohio Blenders has provided this Court with no reason, other than pure speculation and accusation, to disturb the trial court's reasoned conclusion that the RDA's motive was to develop a comprehensive and thoughtful Blight Certification of the entire NWT. The trial court found "[t]he fact that the comparison area is 15 acres cannot be assumed to be in bad faith simply because it is less than half of what the NWT area is." Trial Court Order, January 31, 2008, at 9. Because the record is completely devoid of any evidence which established a "tainted motive" the trial court did not err when it denied Ohio

Blenders' preliminary objection based on bad faith.

Based on the foregoing, this Court affirms the order of the trial court dismissing the preliminary objections of Ohio Blenders.

Judge SMITH–RIBNER dissents.

## *ORDER*

AND NOW, this 8th day of September, 2008, the order of the Court of Common Pleas of York County is hereby affirmed.