In re CONDEMNATION OF LANDS OF George M. LAUGHLIN and Grace S. Laughlin Described in Record Book 886, Page 290 (Tax Parcel No. 41–05–165).

Appeal of Keystone Outdoor Advertising Company, Inc.

Commonwealth Court of Pennsylvania.

Submitted Nov. 4, 2002.

Decided Jan. 13, 2003.

Vincent B. Mancini, Roy T.J. Stegena and Louis Kodumal, Media, for appellant.

John J. Cunningham, IV, West Chester, for appellees.

Before McGINLEY, J., LEAVITT, J., McCLOSKEY, Senior Judge.

OPINION BY Judge LEAVITT.

Keystone Outdoor Advertising Co. (Keystone) appeals from the order of the Court of Common Pleas of Chester County (trial court) that overruled Keystone's preliminary objections to West Whiteland Township's (Township) taking of private property to use as a park.[1]  We affirm.

On September 15, 1997, Keystone entered into a ten-year lease agreement with George M. and Grace S. Laughlin (Laughlins).  The purpose of the lease was to allow Keystone to erect a billboard on the Laughlins' property (Property) located at the intersection of U.S. Route 30 and Pennsylvania Route 100.  This intersection, the busiest in the Township, is commonly known as "Crossroads of Chester County" (Crossroads).  The Property was previously used as a gas station but is now a vacant lot with an abandoned gas station on the adjoining property.  Portions of the Property are within the 100–year flood

1.  Section 406(a) of the Eminent Domain Code (Code) provides that preliminary objections are the exclusive method of challenging condemnation proceedings.  Section 406(a) of the Act of June 22, 1964, Special Sess., P.L. 84, *as amended,* 26 P.S. § 1–406(a).

plain, and only 10,000 out of the Property's 16,595 square feet are usable because of a stream that crosses it. Vehicle and pedestrian access to the Property is difficult. In fact, pedestrians are prohibited from crossing Routes 30 and 100 at the intersection by signs posted at all four corners. There are no sidewalks to, from or on the Property.

On July 10, 1998, Keystone filed a zoning application with Township's Zoning Hearing Board (Zoning Board) to request a variance from the Township's Zoning Ordinance,[2] which did not expressly provide for billboards. In the alternative, Keystone alleged that the Zoning Ordinance violated the United States and Pennsylvania Constitutions because it was exclusionary of billboards.

On August 25, 1998, Joseph Felici (Felici), Vice President of Keystone, and the company's legal counsel attended a meeting of the Township Board of Supervisor's (Board of Supervisors) to discuss Keystone's pending zoning application. At the meeting, the Board of Supervisors expressed their strong opposition to the billboard as inconsistent with the Township's development plans. The Board of Supervisors authorized the Township solicitor to oppose the zoning application, and Keystone appealed to the Township Zoning Hearing Board (Zoning Board).

The Zoning Board conducted hearings on September 16, 1998 and October 21, 1998. At the hearings, Keystone and the Township presented evidence on the feasibility of placing a billboard on the Property. The Zoning Board never ruled on the zoning application because on March 30, 1999, the Township filed a declaration of taking of the Property to establish public park space.[3]

On April 29, 1999, Keystone filed preliminary objections to the Township's declaration of taking. Keystone contended that the Township lacked statutory authority to condemn the Property and, by doing so, the Township had abused its discretion and acted in bad faith. The trial court conducted a hearing on the preliminary objections.

At the hearing, Felici testified that the Board of Supervisors expressed strong opposition to the billboard at the August 1998 meeting, but it gave no indication of a plan to condemn the Property. The Township officials were also silent on the proposed condemnation at the Zoning Board hearings held in September and October of 1998.

Douglas Stewart (Stewart), a professional land planner, also testified on behalf of Keystone. Stewart concluded that "to attempt to use this site for recreational purposes is an ill conceived purpose." R.R. 119a. He based this conclusion on the facts that the Crossroads is the busiest intersection in the county; there is no safe way for pedestrians to access the Property; and it is too small to use for any

---

**2.** Keystone requested variances from the following provisions of the Zoning Ordinance, in addition to any other provisions necessary to comply with it:

\* \* \*

§ 1400.9. No sign shall be erected on any premises except as may be related to a lawful principal use or permitted accessory use on the premises, except on off-site directional sign.

\* \* \*

§ 1400.14 No free standing sign other than official street or traffic direction signs, shall exceed twenty (20) feet in height.

\* \* \*

WEST WHITELAND TOWNSHIP, PA, ZONING ORDINANCE, art. 14 (1994), Reproduced Record 296–297a (R.R. ___).

**3.** This was explained in Township Resolution No. 99–08 dated February 9, 1999 and the Notice to Condemnees.

recreational purpose. Further, the stream crossing the Property makes it impossible to clear and grade the land for development. Because the Property could not be developed for any reasonable recreational use, Stewart concluded that placing a billboard on the Property would be the best use.

Diane Snyder (Snyder), a Township Supervisor, testified on behalf of the Township. Snyder explained that in 1992, the Township developed a Comprehensive Plan for the purpose of improving the overall appearance of the Crossroads. Prior to adoption of the Comprehensive Plan, the Township surveyed residents; the surveys revealed that the residents wanted the Crossroads to be upgraded to improve its overall appearance. Although the Property was not specifically identified in the Comprehensive Plan as belonging to the Laughlins, it was included within the southeast corner of the Crossroads, which was designated by the Comprehensive Plan for "new parks, permanent open space, and resource conservation areas." R.R. 143a–143a. The Comprehensive Plan, a land planning document, was officially adopted in 1994, although it was put into effect in 1993.

Snyder admitted that the Township was unaware that the Property existed when it adopted the Comprehensive Plan. The Township did not become aware of the Property's separate existence[4] until Keystone decided to place a billboard on it.[5] Snyder admitted to stating after the August 1998 meeting "I would empower our solicitor to move heaven and earth to oppose this sign," as had been reported in a newspaper article. R.R. 154a, 595a, 292a.

Thomas Comitta (Comitta), a landscape architect, also testified on behalf of the Township. Comitta authored the Exton Town Center Design Standards (Exton Standards), which were adopted in the summer of 1999 for the purpose of improving the appearance of the Town of Exton. The Exton Standards call for sidewalks, trees, street lights, banners, benches and other such items. The Exton Standards reflect the 1993 Comprehensive Plan and are incorporated into the Township's subdivision and land ordinance. Comitta stated that after Keystone filed its application with the Zoning Hearing Board, he was asked to propose various uses for the Property and to testify at one of the Zoning Board hearings. Comitta prepared a few plans and sketches[6] but he never had to testify.[7]

After the condemnation, in the summer of 1999, the Township Manager asked Comitta to propose a way for the Property to display civic art that would be consistent with the Exton Standards and the Comprehensive Plan. Comitta proposed a likeness of the Guernsey Cow (a local

4. Snyder testified that the Township did not know about the Property because they thought that it was owned by Larry Polite who owned the property to the east. R.R. 147–8a.

5. At her October 18, 2000 deposition, Snyder stated that the Property first became a topic of discussion for the Board of Supervisors when she read the minutes of the August 1998 board meeting. R.R. 17a.

6. Comitta proposed a water ice stand, car wash and a self-service gas station. R.R. 173a. He admitted that none of these ideas were in conformity with the Zoning Ordinance at the time. R.R. 195a.

7. Comitta testified that before the zoning application was filed with the Board, Comitta had considered a quadrant for the Crossroads. The idea was to create a town center and walkable space on all four corners of the Crossroads for pedestrians. In addition, Comitta considered placing a form of architecture or landscape on it such as an arch, sidewalk, and benches. R.R. 177a.

icon), a piece of civic art to be derived from a civic art design competition, or a design by Charrette.[8] Comitta concluded that the Township's intention to use the Property for open space or a park with a memorial is a parklet, a passive recreational use, which is a viable and practical use for the Property. R.R. 183a.

Stephen J. Ross (Ross), the Township Manager, and his assistant, Steven C. Brown (Brown), also testified on behalf of the Township. Ross stated that the Township has not yet developed a specific plan to use the Property,[9] although it was in the process of soliciting ideas from residents. Residents have expressed interest in the project, but for now the development of the Property is on hold. Brown testified that the Township's official map, adopted in December of 2000, designates the Property as open park space.

After reviewing the evidence, the trial court overruled Keystone's preliminary objections. The trial court concluded that the Township's use of the property is a park which is within the use allowed by statute. The trial court reasoned,

Many other townships, cities, and urban communities, like West Whiteland Township have recognized that there is a need for green and open space. "Parklets" have become the answer to this need. A "park" is no longer just acres of land for physical recreation but "parklets" maintained for aesthetics, or as respites, in what would otherwise be an overrun commercial or urban area.

The Crossroads of Chester County is currently a congested, pedestrian unfriendly, intersection. In adopting the 1993 Comprehensive Plan and the Exton Center Design Standards the Township envisions something different. The Township's developmental plans include a more pedestrian friendly Exton Town Center with "parklets" of green and open space at the four-corners of the Crossroads of Chester County. In the future, pedestrians may be able to cross at the intersection for easier access to the shops and restaurants. The Property's immediate use as a "park" or "parklet" for passive and aesthetic recreation may then evolve into a more physical or interactive recreational park. Whether termed a "park," "vest pocket park," "pocket park," or "parklet," we find the Township's taking of the Property for public park purposes within its statutory authority.

Trial Court Opinion, 10–11. The trial court also found that the taking was not in bad faith or an abuse of discretion, stating as follows:

The Township has been promoting the development of the Exton Town Center and the Crossroads of Chester County for many years. Keystone, if not aware of this prior to entering into the lease with the Laughlins, was made aware of this fact at the Board's August 1998 meeting. Keystone has failed to show evidence that the Township's taking was solely conceived in response to Keystone's Zoning Application. The entire record demonstrates that the Township's acts were not capricious or arbitrary but in line and consistent with the Township's vision and development plan. The Township's decision to condemn the Property for a park and recreational

8. Charrette is a process by which public art is designed by members of the community whose proposals are synthesized into one sculpture monument or other piece of artwork. R.R. 559a.

9. However, in his December 14, 2000 deposition, Ross stated that the Township planned to use the Property for a memorial in an attractive park type setting. R.R. 621a.–622a.

uses was based on its 1993 Comprehensive plan that anticipates the present and future needs and plans of the Township.

Trial Court Opinion, 12. Keystone then appealed to this Court.[10]

On appeal, Keystone contends that the trial court erred as a matter of law. It contends that contrary to the trial court's holding, the Township abused its discretion in two ways: (1) it did not have a *bona fide* public purpose for the Property, but (2) even if its rather inchoate plans for the Property constitute a "public purpose," the Township did not establish them *prior* to the condemnation.

Article I, Section 10 of the Pennsylvania Constitution gives the Township the authority to condemn private property for public use. It states "nor shall private property be taken or applied to public use, without authority of law and without just compensation being first made or secured." PA. CONST. art. I, § 10. Thus, to be valid, the condemnation must be in accordance with the law and to advance a public purpose. *Winger v. Aires,* 371 Pa. 242, 89 A.2d 521 (1952).

Here, the Township's authority to condemn private property arises from Section 2201 of the Second Class Township Code, Act of May 1, 1933, P.L. 103, *as amended,* 53 P.S. § 67201. Section 2201 provides,

The board of supervisors *may designate* lands or buildings owned, leased or controlled by the township *for use as parks,* playgrounds, playfields, gymnasiums, swimming pools, indoor recreation centers, *public parks and other recreation areas* and facilities *and acquire*

lands or buildings by lease, gift, devise, purchase *or by the exercise of the right of eminent domain for recreational purposes* and construct and equip facilities for recreational purposes.

*Id.* (emphasis added). Thus, the Board of Supervisors can use its powers to designate land for use as a park and may acquire this land by exercise of the right of eminent domain.

A public park has consistently been recognized by the Pennsylvania Supreme Court to serve a recreational purpose. In *Bernstein v. City of Pittsburgh,* 366 Pa. 200, 206–7, 77 A.2d 452, 455 (1951) (emphasis added), the Court stated that,

A public park may be defined as a tract of ground kept more or less in its natural state, or embellished by the planting of additional trees, and flowers, and *devoted to the purposes of pleasure, recreation and amusement.* ... In modern times the principal purpose of a park, *namely public recreation, is not limited to physical recreation but includes aesthetic recreation and mental and cultural entertainment as well.* While the entire park acreage or any substantial part of it cannot, of course, be built upon so as unduly to destroy the enjoyment of fresh air, sunshine and exercise, the erection within its borders of monuments, museums, art galleries, public libraries, zoological and botanical gardens, conservatories, *and the like, is commonly recognized and accepted as being within the normal scope and ambit of public park purposes,* and an open-air public auditorium comes within the same category as such other permissible structures.

---

10. In eminent domain cases, our review of the lower court decisions is limited to a determination of whether the court abused its discretion or committed an error of law. There is a strong presumption that the municipality has acted properly and the burden is heavy upon one attempting to show an abuse of discretion. *In re Heim,* 151 Pa.Cmwlth. 438, 617 A.2d 74 (1992).

Further, in *Laird v. City of Pittsburgh*, 205 Pa. 1, 54 A. 324, (1903) our Supreme Court explained that,

> [A] public park, in the popularly accepted meaning of the present time, may be comprehensively defined as a *public pleasure* ground .... 'a piece of ground, in or near a city or town, inclosed and kept for ornament and *recreation*'. ... a piece of ground, usually of considerable extent set apart and maintained for public use, and laid out in such a way as to afford pleasure to the eye as well as an opportunity for *openair recreation*.'

*Id.* at 5, 54 A. at 325 (emphasis added) (citations omitted). Thus, we conclude that a public park serves a recreational purpose within the meaning of Section 2201 of the Second Class Township Code.

Here, the Township's stated purpose for condemning the Property was to acquire public park space. As explained by Snyder, the Comprehensive Plan was adopted to improve the appearance of the Crossroads[11] and had always designated the Property as park and open space. The trial court found Snyder's testimony credible, and "[w]e cannot make new and different credibility determinations on appeal."

*In re Condemnation by the Department of Transportation v. Norberry*, 805 A.2d 59, 71 (Pa.Cmwlth.2002). Further, Snyder's testimony was corroborated by the Comprehensive Plan itself. Thus, we hold that the Township had a lawful public purpose when it condemned the Property for a park.

■ Keystone also argues that the Township abused its discretion by condemning the Property because it did not engage in adequate planning *prior* to the taking[12] and only *after* the taking did the Township make real efforts to find uses for the Property. In support, Keystone relies on *Winger v. Aires*, 371 Pa. 242, 89 A.2d 521 (1952) and *Pidstawski v. South Whitehall Township*, 33 Pa.Cmwlth. 162, 380 A.2d 1322 (1977).

In *Winger*, our Supreme Court held that a school board abused its discretion by condemning 55 acres of private land to build a school. The school board had the authority to take property in order to build a school, but the evidence showed that the condemnation was excessive for that use. Thus, the Court concluded[13] that the school board abused its discretion.

---

11. Keystone contends that the trial court erred when it stated that,

> Diane Snyder testified that Keystone's Zoning Application did not trigger the Township's plans for the property. According to Snyder, the Township's plan for the Crossroads of Chester County, including the Property, has been a part of the Township's Comprehensive Plan since 1993.

Trial Court Opinion, 3. Keystone argues that if the trial court meant that the zoning application *did not* trigger the Township's plan to condemn the Property, then it was a reversible error because Snyder testified on several occasions that the Board of Supervisors did not even know about the Property until the August 1998 meeting which was after the zoning application was filed. Keystone's Brief, 38–40. However, taking the first statement into context, it is obvious that the trial

court was attempting to indicate that the Township had been interested in the Crossroads since 1993, which included the Property. Thus, this argument has no merit.

12. Specifically, Keystone argues that the Township did not perform a survey; engage in long range planning for use of the Property; obtain funding for the development of the Property; obtain a recommendation from a governmental agency to condemn the Property; access the suitability of the Property for this use; or obtain the opinion of the Township residents regarding the condemnation for this purpose.

13. The Court also noted that the school board failed to engage in adequate preparation prior to the taking.

In *Pidstawski,* a township filed a declaration of taking for 80 acres of land to use for the "Jordan Creek Parkway Project." The Project was to acquire land to establish the township's first community recreational area, park area, and open space area in order to preserve the natural beauty of the Jordan Creek site, which also had historical significance. The condemnees argued that the township abused its discretion because the taking was excessive in light of other park areas in or near the township. This Court, however, found that the township carefully planned the taking with a view toward present and future requirements [14] and had strong community support for the taking. Accordingly, this Court upheld the condemnation.

Here, the Township did not condemn an excessive amount of land, as did the school board in *Winger.* Further, as did the township in *Pidstawski,* the Township produced evidence that it had planned to use the Property as a park prior to the taking. In addition, the response to the Township's surveys undertaken for the Comprehensive Plan demonstrate community support for the taking. In sum, *Winger* is distinguishable, and *Pidstawski* supports the trial court's holding in this case.

The Township's efforts with respect to the Property after the condemnation also support the trial court's conclusions. The Township has retained a landscape architect and solicited input from residents. Although it is still undecided whether the Property should be left as open space or should have a memorial or some form of artwork placed on it, this fact does not change the nature of the Property's use as a park. It is only a question of what kind of park. Therefore, we hold that the Township did not abuse its discretion by condemning the Property for public park space.[15]

Accordingly, we affirm the decision of the trial court.

### ORDER

AND NOW, this 13th day of January, 2003, the order of the Court of Common Pleas of Chester County, dated February 7, 2002, in the above-captioned matter, is hereby affirmed.

---

**14.** The Court in *Pidstawski* found that the condemned property had historical importance and was first discussed by officials in 1966. The township conducted studies; government boards recommended and supported setting aside the property for the proposed public use; the property was a natural choice for the proposed public use; the township's comprehensive plan recommended setting aside property for that use; survey of the residents supported the condemnation; and the township acquired funding for the proposed use. *Pidstawski,* 380 A.2d at 1324.

**15.** Keystone also argues that the trial court erred by stating that "[t]he parties agreed that the dispositive issue is whether the Township's intended use for the property comes within the definition of a park." Trial Court Opinion, 1. However, counsel for Keystone stated before the trial court that,

> I believe under the law the real issue is whether this property was taken for public purpose or not, whether it was good faith or bad. If it was in bad faith, it's even worse. *The question is whether it was taken for legitimate public purpose.* As part of our position, that if it was taken for the ostensible purpose to which they identified, then I think that purpose needs to be scrutinized in these proceedings, your honor.

R.R. 120a (emphasis added). Keystone's counsel admitted that this was an issue for the trial court to decide. Therefore, this argument is disingenuous and lacks merit.