IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | |
|---|---|
| In Re: Condemnation Of Fee : | |
| Simple Or Absolute Title : | |
| Lands Owned By Carl B. Motta, : | |
| Known as 100 West First Street, : | |
| Birdsboro, Berks County, Pennsylvania, : | No. 2459 C.D. 2015 |
| Containing Approximately 0.44 Acres, : | |
| And Any and All Other Unknown : | Argued: June 6, 2016 |
| Occupants Or Other Parties in : | |
| Possession Or Interest For The Purpose : | |
| of Road Improvements And : | |
| Implementing, In Part, The Provisions : | |
| Of The Redevelopment Area Plan : | |
| For The Armorcast Redevelopment Area : | |
| Located In The Borough of Birdsboro, : | |
| Berks County, Pennsylvania : | |
| : | |
| Appeal of: Carl B. Motta : | |


BEFORE:   HONORABLE ROBERT SIMPSON, Judge
HONORABLE PATRICIA A. McCULLOUGH, Judge
HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge


*OPINION NOT REPORTED*

MEMORANDUM OPINION
BY JUDGE McCULLOUGH                          FILED: November 30, 2016


Carl B. Motta (Condemnee) appeals from the October 30, 2015 order of the Court of Common Pleas of Berks County (trial court), which overruled his preliminary objections to the Declaration of Taking filed by the Redevelopment Authority of the County of Berks (Authority). For the reasons that follow, we affirm in part and reverse and remand in part.

## Facts and Procedural History

Condemnee owned a 0.44-acre lot (Property) in the Borough of Birdsboro, Berks County, Pennsylvania, at 100 West 1st Street; generally, the Property is located at the southwest corner of the intersection of 1st Street and Furnace Street. The Property contains a vacant, one and one-half story frame structure formerly used as a railroad freight station (Station). (Trial court op. at 2-3; Reproduced Record (R.R.) at 17a-20a, 46a.)

The Authority assisted the Borough of Birdsboro Council (Borough) with a redevelopment project (Project) that involved the redevelopment and revitalization of a former industrial site (Armorcast) and its surrounding area. A redevelopment plan (Plan) for the Project was developed and adopted by the Borough Planning Commission (Commission) pursuant to the Urban Redevelopment Law (URL), Act of May 24, 1945, P.L. 991, *as amended*, 35 P.S. §§1701-1719.2. The Plan, dated March of 2014, incorporated fourteen goals of the Borough for the Project, specifically:

1. Redevelopment of Armorcast site
2. Improve ingress and egress to Armorcast site
3. Rehabilitation of housing
4. Extension of Thun Trail
5. Improvements to Birdsboro Main Bird Park
6. Improvements to Vest Pocket Park
7. Expansion of area around Legion Baseball Field in Birdsboro
8. Improve SR 724 to extent possible
9. Re-zone Armorcast site as necessary for new development
10. Improve curbing, sidewalks and streets in area as necessary

2

11. Develop financial incentives for property owners to improve facades along Furnace Street between Main Street and Office Street
12. **Improve intersection of Furnace Street and 1st Street**
13. Abandon Cow Lane
14. Realign intersection of Water Street and Main Street

(R.R. at 31a) (emphasis added).  Here, the relevant goal of the Borough is No. 12, i.e., to "[i]mprove intersection of Furnace Street and 1st Street." (R.R. at 31a.) Condemnee's Property is located at the southwest corner of this intersection.  Item 7 of the Plan denoted the proposed acquisition of "the property at the southwest corner of Furnace Street and *Water* Street for purposes of improving this intersection." (R.R. at 36a.)  The reference to Water Street, as opposed to 1st Street, appears to be in error.[1] (R.R. at 30a-43a.)

Pursuant to the URL, the Authority then prepared and adopted a proposal (Proposal) for implementation of the Plan.  In an April 2014 Proposal, the Authority specifically identified Condemnee's property for acquisition as follows:

> In addition it is proposed to acquire the **parcel located at the southwest corner of Furnace Street and Water Street.**  This property contains a one and one-half story frame structure.  The structure is vacant.  **It was formerly used as a railroad station.**
>
> From information provided by the Berks County Board of Assessment the portions of the Armorcast site to be acquired are identified as being within the following parcel:

---

[1] The only "goal" that referenced improvement of a particular intersection was No. 12, which involved the intersection of Furnace Street and 1st Street.  Moreover, upon review of the Plan's maps, Furnace Street and Water Street do not intersect.  Therefore, the actual reference is to the property at the southwest corner of Furnace Street and *1st* Street. (R.R. at 31a, 36a, 38a-40a, 46a-47a.)

3

| | |
|---|---|
| **Parcel ID:** | **31534413148781** |
| **Owner:** | **Motta, Carl B.** |
| Mailing Address of Owner: | 181 Troxel Road |
| | Birdsboro, PA 19508 |
| Municipality: | Borough of Birdsboro |
| Map PIN: | 534413148781 |
| **Assessed Acres:** | **0.44** |
| Total Assessed Value: | $45,400 |
| Assessed Use Code: | 4200 |
| Assessed Class: | Commercial |
| Description: | Commercial Building |

(R.R. at 46a-47a) (emphasis added). Despite the Proposal's inclusion of an identical error in referring to Water Street, as opposed to 1st Street, the information immediately following the same further describes the parcel for acquisition as containing a one and one-half story vacant frame structure formerly used as a railroad station. Additionally, the county assessment information denoted the 0.44-acre parcel by parcel identification number and identified Condemnee as the owner of the parcel. Hence, it is clear that the property to be acquired is that of Condemnee. (R.R. at 44a-65a.)

Following notice by publication,[2] the Borough held a public hearing on the Plan and Proposal on August 11, 2014, after which it adopted the Plan and Proposal. On September 23, 2014, the Authority adopted Resolution No. 5, which authorized the condemnation of Condemnee's property. Similarly, on October 6, 2014, the Borough authorized the taking in its adoption of Resolution No. 14-24. (Trial court op. at 2-3; R.R. at 56a-60a, 131a-32a.)

_____

[2] The public notice of the hearing provided that Condemnee's property ("100 West 1st Street") was slated for full acquisition in the Project. (R.R. at 131a.)

4

On October 22, 2014, the Authority filed a Declaration of Taking pursuant to the Eminent Domain Code (Code), 26 Pa.C.S. §§101-1106, and the URL. The Declaration of Taking stated that the condemnation was for the public purpose of road and intersection improvements as part of a larger redevelopment project. Attached to the Declaration of Taking were, *inter alia*, the Commission's Plan and the Authority's Proposal for the Project. The condemnation included Condemnee's property as well as the Station. (Trial court op. at 2-3; R.R. at 17a-21a, 30a-43a; 44a-54a.)

On December 9, 2014, Condemnee filed preliminary objections to the Declaration of Taking,[3] contending that the taking was excessive, arbitrary, capricious, an abuse of discretion and/or was done in bad faith. Specifically, Condemnee asserted that the taking of his property was not properly authorized by the Borough; the description of the property condemned was vague and ambiguous; there was no demonstrated need for the taking for roadway improvements or the Project; the real and fundamental purpose of the taking was to acquire the Station; and, the taking of the entire property and Station was excessive. The Authority responded that the taking was properly authorized by the Borough; the content of the Declaration of Taking comported with the requirements of the Code; the condemnation was for a lawful public purpose; and, the acquisition of the entire property, including the Station, was necessary for the intersection improvements.

In lieu of a hearing, the parties submitted briefs and the deposition testimony of Kenneth Pick (Pick), Executive Director of the Authority; Aaron J.

---

[3] The filing of preliminary objections is the exclusive method of challenging, *inter alia*, the power or right of the condemnor to appropriate the condemned property, the declaration of taking, and any other procedure followed by the condemnor. 26 Pa.C.S. §306(a)(3).

Durso (Durso), Borough Manager; Brian T. Boyer, P.E. (Boyer), Borough Engineer; and Condemnee. This testimony is summarized below.

Pick testified that the redevelopment area involved an industrial site (Armorcast) located in both Union Township and the Borough. Years ago, the Authority assisted Union Township and the Borough with a joint redevelopment plan for the site, which was the primary emphasis of the project. However, both municipalities had other goals they wanted to include. This joint municipal project fell through and was never adopted. (R.R. at 79a-81a, 86a, 89a.)

In late 2013 or early January 2014, Pick stated, the redevelopment process for the site proceeded again but only with the Borough. The Authority assisted the Borough with the redevelopment process but Pick testified that the Plan was that of the Borough. Again, the emphasis of the Plan was on the site, but the Borough included additional activities as goals in the Plan. According to Pick, the Borough determined the boundaries of the redevelopment area[4] and generated the information contained in the Plan; the Authority's consultant took that information and put it in the proper format. (R.R. at 31a, 80a-83a, 85a-87a, 89a-90a, 127a.)

Pick testified that the Authority filed the Declaration of Taking for Condemnee's property and did so as agent for the Borough. According to Pick, Condemnee's property was taken for the Borough's goal of improving the intersection at Furnace Street and 1st Street. Pick further testified that Condemnee's property was within the general boundary description of the redevelopment area and was identified for acquisition in the Proposal and the acquisition map attached

_____

[4] Once the Commission determined the redevelopment area of this Plan, no changes were made to those boundaries. (R.R. at 90a, 103a.)

6

thereto.[5]   Pick acknowledged that the Proposal's reference to the parcel at the intersection of Furnace Street and "Water Street" was in error, but stated that the county assessment information correctly identifying Condemnee's property by owner and parcel identification number was set forth immediately following that statement.[6] Pick also indicated that the Borough's goal of improving the intersection of Furnace Street and 1st Street is contained in the Plan, and that the Proposal merely implements the Plan.[7]  (R.R. at 51a-54a, 89a-90a, 101a-09a, 120a, 123a.)

Pick memorialized the minutes of the hearing on the Plan/Proposal held on August 11, 2014, at which he stated that the Authority would save the Station and relocate it for use on another Authority project.  Pick recalled the Borough adopting the same after the hearing.  Pick testified that the Authority's resolution authorizing the filing of the Declaration of Taking preceded that of the Borough's due to the timing of their public meetings.  Pick emphasized, however, that the acquisition of Condemnee's property had already been approved by the Borough when it adopted the Plan/Proposal.  (R.R. at 56a-60a, 104a-05a, 112a-16a, 126a-27a, 131a-32a.)

Pick acknowledged that the Station was a historic freight station designed by Frank Furness, who was instrumental in designing a number of freight

---

[5] Condemnee's property is Parcel Number 140 on the Borough's map of the redevelopment area.  (R.R. at 40a.)

[6] The assessed value of Condemnee's property, including the Station, is $45,400.00.  (R.R. at 47a, 125a.)

[7] Pick testified to the general redevelopment process as follows:  the Plan is that of the Planning Commission; the Authority then assists the Borough in implementation of that Plan by preparing a Proposal; the Borough holds a public hearing on the Plan/Proposal; then the Borough approves or rejects the Plan/Proposal.  (R.R. at 107a-08a.)

stations for the Pennsylvania Railway. Pick testified that the Authority generally takes the buildings in addition to the land when it exercises its power of eminent domain and demolishes them unless they can be used in other Authority projects; here, the Authority had use for the Station on another project. (R.R. at 90a-91a, 97a, 115a, 124a.)

At the end of March, the Authority acquired the Colebrookdale spur rail line (Rail) and a small property in Pottstown for use with the same.[8] The Rail is leased to a private company owned by the Colebrookdale Railway Preservation Trust (Trust), and Nathaniel Guest (Guest) is the Trust's president. Pick testified that the Authority wanted to either move a station to, or build a station on, the Pottstown property, and Guest approached him with the suggestion that the Station be placed there because of its appropriate size. Pick testified that the Authority intended to move the Station to Pottstown. The cost of moving the Station, without reassembly, is approximately $40,000.00; the cost of the entire project, including reassembly of the Station, is approximately $800,000.00. After the Station was reassembled, the Authority would transfer the Rail and the Pottstown property, including any improvements thereon, to the Trust. (R.R. at 91a-95a, 98a-99a, 118a.)

However, Pick asserted Condemnee's property was taken to improve the intersection and not to acquire the Station; rather, the Station was merely a collateral benefit. Pick acknowledged that he was wearing another hat, i.e., to successfully complete the Rail project, but emphasized that the Authority would acquire Condemnee's property for the Project regardless of whether the Station was there,

---

[8] Pick testified that the Authority does not receive any revenue from the Rail project. (R.R. at 92a.)

8

and would continue with the Rail project regardless of whether the Station was acquired.[9] Pick testified that neither he nor the Authority influenced the Borough to design the intersection in such a way so that the Authority could obtain the Station. (R.R. at 99a-101a, 123a-26a.)

Durso testified that he oversees the daily operations of the Borough. Prior to becoming Borough Manager, Durso was a Borough council member and part of the joint redevelopment discussions with Union Township. Durso explained that the Borough had been approached by the state with a request for an extension of the Keystone Opportunity Zone (KOZ), which covered the industrial site and other areas of the Borough. Discussion for the joint plan included improvements to the intersection. Ultimately, the Borough approved the extension of the KOZ but Union Township did not and dropped out of the discussions. (R.R. at 136a-37a.)

According to Durso, the Borough discussed the need to acquire Condemnee's property for these intersection improvements during Commission meetings dating back to 2013, when the redevelopment proceeded solely with the Borough. Durso explained that, early in the process, the Authority asked the Borough its goals for the Plan, which the Borough discussed and determined, and the Authority's consultant included them in the Plan.[10] Durso stated that problems with traffic backing up at that intersection has been occurring for years, and the Borough has received complaints from many residents as well as Borough council members. Durso testified that the backups occur throughout a good portion of the day, primarily

---

[9] Although Pick was unsure of what action would be taken, he posited that the Authority could build a station. (R.R. at 100a.)

[10] Durso testified that the fourteen stated goals of the Plan were those expressed by the Borough at the beginning of the process, which were subsequently approved by the Commission and the Borough.

9

during school and work commutes.[11] Durso stated that the Borough discussed putting in a right-hand turn lane on Condemnee's side of the intersection to alleviate these backups. (R.R. at 31a, 137a-41a, 145a-53a, 157a, 164a, 167a-69a.)

The Borough's proposal of a right-hand turn lane, Durso testified, is a concept plan; the Borough would be required to obtain right-of-way permits from the Commonwealth of Pennsylvania, Department of Transportation (PennDOT) and the improvement will likely involve the relocation of utilities.[12] Durso further testified that a vast majority of Condemnee's property would be needed for this improvement, and any property remaining thereafter would be unable to conform to zoning. (R.R. at 140a, 158a, 162a.)

Durso testified that the Borough consulted its engineer as to what improvement should be made to the intersection, and its engineer was in attendance at the public hearing on the Plan/Proposal on August 11, 2014. Apart from the engineer's preparation of the drawing of the right-turn lane dated February 9, 2015, the Borough had not authorized its engineer to expend any funds relative to the improvement; rather, the Borough was waiting until the Authority acquired the property and turned it over to the Borough before doing so. (R.R. at 140a, 154a, 158a-62a, 167a.)

---

[11] Durso also testified that it was difficult to make turns at the intersection and a utility pole and a sign at the intersection have been struck by vehicles within the last few years. (R.R. at 141a-45a.)

[12] Durso indicated that the intersection improvement was not suggested by anyone at PennDOT; rather, the Borough would be required to raise the suggested improvement to PennDOT when the Borough makes application to PennDOT for the right-of-way permits. (R.R. at 140a, 154a, 158a-62a, 167a.)

No one at the Authority, Durso stated, suggested the improvement to this intersection. Durso testified that Pick informed the Borough that if the Authority took Condemnee's parcel, the Authority would own the property on the parcel, and the Authority intended to move the Station to Pottstown. According to Durso, no Borough council or Commission member expressed any concerns about moving the Station or that the Station should remain in the Borough. Durso did not recall Guest attending any of the meetings, and testified that neither he nor anyone on Borough council or the Commission have any interest or involvement with the Rail. Durso stated that Pick prepared the minutes of the August 11, 2014 hearing because the Authority was presenting the Plan/Proposal to Borough Council, and that the minutes indicated that the Authority had already begun the acquisition of Condemnee's property.[13] Although Durso was familiar with a letter dated June 12, 2014, from Pick to Condemnee,[14] Durso stated that the Borough was not part of the Authority's process for acquisition of the land. (R.R. at 146a, 154a-56a, 163a, 165a, 167a, 171a-72a, 178a.)

Boyer testified that he has been the Borough Engineer since 2011. Boyer stated that the Borough Manager and Borough council assigned him tasks with

---

[13] In pertinent part, the August 11, 2014 minutes provided:

> Any acquisitions will be attempted through voluntary sales prior to the use of eminent domain. The Authority has already begun the acquisition of land necessary to improve the Furnace & First Street intersection, Goal #12.

(R.R. at 132a.)

[14] In the letter, the Authority stated that the appraisal of Condemnee's property had been completed and offered to purchase Condemnee's property, including the Station, for the sum of $71,000.00, as just compensation for the property. (R.R. at 178a.)

11

respect to the Project, and that most of his direction comes from the Borough Manager. Boyer explained that the intersection is currently controlled by an antiquated traffic signal, and the traffic issue involved a significant stacking on West 1st Street during the peak hours in the morning and afternoon due to vehicles accessing or exiting the elementary school. (R.R. at 181a-86a.)

Boyer attended the Planning Commission meetings and most of the Borough council meetings pertaining to this Project, which included the approval of the Commission's Plan and the hearing of August 11, 2014. At the end of January 2015 or early February 2015, Boyer was asked to prepare a concept of the right-turn lane design, which is the drawing dated February 9, 2015. In preparing the design, Boyer followed the PennDOT template for highway access by driveways or local roads. The design begins with a 12-foot road width, which expands to approximately 23 feet from curb to curb in the right-turn lane in order to make the turning movements. Boyer determined that the traffic numbers of this intersection would be close to that required for a high-volume driveway.[15] Under this design, most vehicles, regardless of size, would be able to travel through the right-turn lane at the intersection, such as normal automobiles and trucks, delivery trucks, and fire trucks. (R.R. at 130a, 181a-92a.)

To determine the approximate boundaries of Condemnee's property, Boyer used raw data from the current deed and tax map, aerial photographs, site visits, and a survey and land development plan from other projects on West 1st Street.

---

[15] Boyer testified that Title 67 of the Pennsylvania Code defines "high-volume driveway" as "a driveway used or expected to be used by more than 1,500 vehicles per day," (R.R. at 190a), and that he considered this to be a high-volume driveway under PennDOT's definition, which considers local roads and driveways in the same fashion. Boyer did not perform a traffic study to get an exact traffic count. (R.R. at 190a-91a.)

Based upon the portion of the parcel required for the improvement, any property remaining would be very difficult to develop and for very limited uses; the Station would have to be removed or relocated. Technically, a very small building could be built, i.e., a "Fotomat-type" site, but parking would still have to be accounted for. Further, the parcel's driveway on West 1st Street would be eliminated by the right turn lane and the installation of another driveway along West 1st Street would not be recommended. Boyer testified that widening the road on the north side of the intersection, as opposed to Condemnee's side, would not make sense unless it was done to improve the turning movements from South Furnace Street onto West 1st Street, and those ADA ramps were PennDOT's responsibility. However, Boyer testified that widening the road on the north side of the intersection would not alleviate these specific traffic problems. (R.R. at 185a-88a.)

In his deposition, Condemnor, whose address is 181 Troxel Road, Birdsboro, Pennsylvania, testified that he obtained the Station property years ago from his father. Currently, he keeps an eye on the property, pays taxes, and maintains it by mowing the grass, cleaning the sidewalks, and plowing for parking.[16] Other than securing the building in response to a Borough enforcement notice and shoring up the bottom of the Station so that it could be readily moved, no other use has been made of the property for approximately fifteen or twenty years. (R.R. at 199a-201a, 217a-18a, 229a.)

Condemnee indicated that he first learned of plans to acquire his property in a letter from Pick dated February 7, 2014, which indicated that it

---

[16] Condemnee testified that he recently began to receive revenue from permitting cars to park on the property. (R.R. at 229a.)

13

pertained to "100 West 1ˢᵗ Street, Armorcast R.A." (R.R. at 237a.) The letter advised that the Authority, on behalf of the Borough, was interested in acquiring his property at "100 West 1ˢᵗ Street, Birdsboro" for a proposed project that may receive funding assistance from the Community Development Block Grant (CDBG) Program administered by the U.S. Department of Housing and Urban Development (HUD). The letter stated that its purpose was to inform Condemnee of his rights under the Uniform Relocation Assistance and Real Property Acquisition Policies Act (URA)[17] and included a HUD brochure entitled "When a Public Agency Acquires Your Property," which contained information about the public acquisition of real estate under the URA. The letter informed Condemnee that his property was only being considered for acquisition at that time, and that if his property was "selected for acquisition, under URA, [he would] have the right to receive just compensation for [his] property." (R.R. at 237a.) Under those circumstances, in order to determine the amount of just compensation to offer, an appraisal would be performed and Condemnee would be contacted by the appraiser to schedule the same. Additionally, the letter provided:

> For your information, the Borough and the [Authority] possess eminent domain authority to acquire the property needed for this project, however, our goal is to attempt to negotiate amicable agreements for all acquisitions prior to its use. If negotiations fail, acquisition under eminent domain may be considered.

(R.R. at 202a-04a, 224a-25a, 237a.)

On the morning of February 14, 2014, a meeting took place at the Station between Condemnee, Guest, Pick, and another individual. Condemnee

---

[17] 42 U.S.C. §§4601-4605.

testified that Guest contacted him approximately one week prior to the meeting and expressed renewed interest in acquiring the Station.[18] Condemnee thought he was only meeting with Guest and was surprised that Pick and another individual attended the meeting as well. According to Condemnee, there was no discussion about needing his property to improve the intersection; rather, the discussion was limited to the potential use of the Station in the Rail project. (R.R. at 226a-28a.)

Condemnee testified that after the February 7, 2014 letter, the only other notice he received was a letter from Pick dated June 12, 2014. The June 12th letter, referring to "100 West 1st Street, Armorcast R.A.," stated that the appraisal of his property had been completed, and the Authority offered Condemnee the sum of $71,000.00 as just compensation for Condemnee's interest in the land and Station. The letter instructed that Condemnee was to sign and date the letter in the space provided if he found the offer acceptable, whereupon arrangements would be made regarding an Agreement of Sale. Condemnee declined the offer. (R.R. at 178a, 212a, 220a-21a.)

Condemnee testified that he did not attend any meetings with the Borough or the Authority regarding the inclusion of his property in the Project's redevelopment area, including the August 2014 meeting, because he was not informed of the meetings. Condemnee further testified that after he received the February 2014 letter from the Authority, he spoke with Durso, who informed him of the block grant and paving the road, and that his property was included in the Project

---

[18] Condemnee stated that Guest first approached him about acquiring the Station approximately four years ago, and Guest was supposed to receive funding to accomplish the acquisition. Guest told him that he liked the Station because of its architecture and history. A few months prior to the meeting, Guest ceased communications with him regarding the potential acquisition. Then, one week prior to the meeting, Guest contacted him and stated that he was still interested in acquiring the property. (R.R. at 213a, 223a-27a.)

15

to obtain those funds. According to Condemnee, Durso did not tell him of intersection improvements or a turning lane. (R.R. at 207a-09a, 228a.)

Condemnee stated that he was not aware of problems with traffic backing up or vehicles having difficulty making right turns travelling eastbound on West 1st Street to Furnace Street.[19] Condemnee acknowledged, however, that he does not reside at the property and does not visit the property on a daily basis. As for difficulty making turns, Condemnee testified that the intersection was a tight area and in a main part of town, but that one could wait for the light and go into the intersection to make the right turn. (R.R. at 230a-35a.)

Condemnee stated that any taking of the property would devalue it and destroy its commercial value. Condemnee stated that he has invested in the property, it is the future source of income for his family, and it is part of a legacy. Condemnee indicated that he has future goals to commercially develop the property in some fashion, but never presented a concrete plan in that regard.[20] Rather, he testified that

---

[19] Condemnee recalled one tractor-trailer truck getting lost and destroying his sign, but stated that it was not due to a lack of a turn lane for vehicles travelling eastbound on West 1st Street to Furnace Street. (R.R. at 209a, 230a-35a.)

[20] According to Condemnee:

> [I]t was going to be a restaurant. Then there was going to be a wood shop, with antiques. And it was also going to be a flower outlet. Then it was going to be – it could be, you know – a couple other people approached me about a Dunkin Donuts, and whatnot.
>
> I mean, it's the only corner left in Borough of Birdsboro.

(R.R. at 205a.) Condemnee also testified that it was going to be a library. Further, he stated that he held title to the property to have a holiday location accessible to the public for his family garden business. In addition, he indicated that he wanted to have the Station placed on the National Register of Historic Places, but that he has not made application for the same. Condemnee stated **(Footnote continued on next page…)**

16

he has options with respect to the Station: he could sell it, move it to another property that he owns, or move it to the back of the property and fix it up.[21] However, Condemnee acknowledged that he never applied for and was never denied any permits, licenses, or approvals from the Borough or the State Department of Labor and Industry for a commercial use of the building.[22] (R.R. at 201a, 205a-07a, 210a, 215a, 217a, 219a, 222a-23a.)

The parties submitted briefs and, on October 29, 2015, the trial court heard argument on the preliminary objections. By order dated October 30, 2015, the trial court overruled Condemnee's preliminary objections and Condemnee appealed. On December 18, 2015, the trial court filed an opinion in support of its order following Condemnee's filing of a concise statement of errors complained of on appeal. *See* Pennsylvania Rules of Appellate Procedure (Pa.R.A.P.) Rule 1925(a).

---

**(continued…)**

that the property was worth a lot of money if it was commercially developed the right way and with the right businessperson. (R.R. at 201a, 204a-05a, 208a, 228a.)

[21] Condemnee also testified that there was a possibility of moving the Station to land owned by the Borough at St. Mark's, if the Borough wanted to keep the Station in the Borough, where he could make it a retail location. (R.R. at 214a-15a.)

[22] Condemnee testified that he approached Borough officials many times about the setbacks and other requirements for a retail operation because he wanted to do things properly, but that he held off on making application for permits and approvals because he wanted to see what could be done with the property. Condemnee stated that the Borough informed him that when he did apply for commercial use, he could build anything as long as it was within the applicable setbacks and what the zoning ordinance permitted. (R.R. at 201a-02a, 206a.)

On appeal,[23] Condemnee reiterates the arguments raised in his preliminary objections with the exception of the argument that the description of the property contained in the Declaration of Taking is vague and ambiguous. The Authority responds similarly to its opposition of Condemnee's preliminary objections.

## Discussion

There is no dispute that the Authority is clothed with the power of eminent domain. The Authority's power derives from the URL and The County Code, Act of August 9, 1955, P.L. 323, *as amended*, 16 P.S. §§101-2401, and is effectuated through the procedures set forth in the Code. Pursuant to section 9 of the URL, the Authority exercises the public powers of the Commonwealth and may act as the agent of the Borough for the public purposes set forth in the URL. 35 P.S. §1709. In furtherance thereof, the Authority is conferred all powers necessary or appropriate to carry out and effectuate the purposes and provisions of the URL, including:

> (e)    To arrange or contract with any municipality located, in whole or in part, within the Authority's field of operation, or with the State or Federal Government for the furnishing, planning, replanning, constructing, installing, opening or closing of streets, roads, roadways, alleys, sidewalks or other places or

---

[23] In eminent domain cases, our review is limited to whether the trial court abused its discretion or committed an error of law. *In re Commonwealth, Department of Transportation*, 137 A.2d 666, 669 n.2 (Pa. Cmwlth. 2016). Further, in URL condemnation cases, we review whether the authority has acted in bad faith or arbitrarily, if it has followed the mandated statutory procedures in preparing a redevelopment plan, and whether there was a constitutional violation. *York City Redevelopment Authority of the City of York v. Ohio Blenders, Inc.*, 956 A.2d 1052, 1063 (Pa. Cmwlth. 2008).

facilities, or for the acquisition by such municipality, or State or Federal Government of property options or property rights or for the furnishing of property or services in connection with a redevelopment area;

* * *

(i) To acquire by eminent domain any real property, including improvements and fixtures, for the public purposes set forth in this act, in the manner hereinafter provided, except real property located outside a redevelopment area.

35 P.S. §1709(e), (i). Additionally, the URL authorizes the Authority to exercise the right of eminent domain in the manner provided by law for the exercise of such right by the county of the same class in which the Authority is organized to operate. Section 12 of the URL, 35 P.S. §1712. The Authority operates in the County of Berks, a third class county, and may exercise its right of eminent domain as follows:

In all cases where the power of eminent domain is conferred upon the county by law, the county may enter upon, appropriate, take, injure or destroy private lands, property or material.

Section 102 of The County Code, 16 P.S. §102. However, Condemnee argues that the Authority's taking was done in bad faith, was arbitrary, capricious, an abuse of discretion, and/or was excessive.

**Bad Faith**

Condemnee argues that the taking was done in bad faith and that the stated reason for the taking, i.e., for improvements to the intersection of Furnace Street and 1st Street, was merely a subterfuge for the real and fundamental purpose

19

of the taking – to obtain the Station to benefit the Authority and the Trust. We disagree.

Bad faith describes conduct of a dishonest nature and implies a tainted or fraudulent motive. *Erie Municipal Airport Authority v. Agostini*, 620 A.2d 55, 57 (Pa. Cmwlth. 1993). Further, bad faith becomes palpable when it is "obvious or unambiguously perceived." *York City Redevelopment Authority of the City of York v. Ohio Blenders, Inc.*, 956 A.2d 1052, 1063 (Pa. Cmwlth. 2008). There is a strong presumption that the Authority and the Borough acted properly with respect to the taking. Therefore, Condemnee has a heavy burden to overcome that presumption. Notably, bad faith must be proven by "clear, precise and indubitable evidence." *Id.*

"The *sine qua non* of any condemnation is that it must serve a public purpose." *Bear Creek Township v. Riebel*, 37 A.3d 64, 69 (Pa. Cmwlth. 2012). The Court looks to the "real or fundamental purpose" behind a taking to determine whether its true purpose primarily benefits the public. *Middletown Township v. Lands of Stone*, 939 A.2d 331, 337 (Pa. 2007); *Belovsky v. Redevelopment Authority,* 54 A.2d 277, 283 (Pa. 1947). As we have noted, "**a taking is proper if the benefit to the public is primary and any benefit to a private individual is only incidental**." *In re Condemnation of Land for the South East Central Business District Redevelopment Area #1*, 946 A.2d 1143, 1147 (Pa. Cmwlth. 2008) (quoting *In re Forrester*, 836 A.2d 102, 105 (Pa. 2003)) (emphasis in original).[24]

---

[24] A taking does not lose its public character simply because there may be some feature of private gain. Rather, if the public good is primarily enhanced, it is immaterial that a private interest may also benefit. *In re Forrester*, 836 A.2d at 105; *see Appeal of Yarnall*, 946 A.2d 1143, 1148 n.6 (Pa. Cmwlth. 2008) (finding that a public purpose was the predominant reason for the taking although there was private gain to the developer incident to the take).

Thus, in considering whether a public purpose is the true and primary reason for the taking, we examine whether the condemnor's investigation led to an intelligent plan that demonstrates informed judgment. *Downington Area School District v. DiFrancesco*, 557 A.2d 819, 821-22 (Pa. Cmwlth. 1989). Notably, we have considered the condemnor's planning prior to the condemnation, as well as the condemnor's efforts made with respect to the property after the take. *In re: Condemnation of Lands of Laughlin*, 814 A.2d 872, 877-78 (Pa. Cmwlth. 2003).

We begin with the public purpose set forth in the Authority's Declaration of Taking, i.e., for "the laying out, opening, widening, extending, vacating, grading, or changing the grades of lines or streets and intersection improvements, and for improvements to a public road intended for travel by the public, including free and uninterrupted ingress, egress and regress, as a part of a [redevelopment] plan . . . ."[25] (Declaration of Taking, ¶4, R.R. at 18a.) As discussed below, the evidence clearly shows that Condemnee's property was taken for the public purpose of intersection improvements, as part of a larger scale redevelopment Project, and that the same was the true and primary purpose of the taking.

The trial court credited Durso's testimony regarding problems at that intersection, which included traffic backing up on West 1st Street and approaching Furnace Street. According to Durso, the Borough received numerous complaints from residents and Borough council members, and the Borough discussed putting in a right-hand turn lane on Condemnee's side of the intersection to alleviate these

---

[25] The Declaration of Taking further stated that the taking was "for the development of a roadway system and intersection improvements which will help enhance traffic and pedestrian safety" and was "necessary to complete the project by providing legal right-of-way, intersection improvements, permanent easements, and temporary construction easements for said roadway and construction thereof." (Declaration of Taking, ¶6, R.R. at 19a.)

backups. The Borough discussed the need for improvements to this intersection, as well as the need for Condemnee's property to accomplish the same, prior to and during the preparation of the Plan.

The Borough adopted its Plan for the Project, wherein it included the Borough's stated goal to "Improve intersection of Furnace Street and 1st Street." (Plan, Goal No. 12, R.R. at 31a.) Condemnee's property, located at the southwest corner of Furnace Street and 1st Street, was specifically identified for acquisition in both the Plan and the Proposal for the Project. As noted above, any error made in reference to one of the streets of the intersection was obviated by the language in goal No. 12 of the Plan, stating that particular improvements were to be made to the intersection of Furnace Street and 1st Street, and the Proposal's clear identification of Condemnee's property and the Station by parcel identification number and setting forth Condemnee as owner. (R.R. at 31a, 46a-47a.)

Consistent therewith, the public notice of the Borough's hearing on the Plan and Proposal provided that Condemnee's property ("100 West 1st Street") was slated for full acquisition in the Project.[26] Durso testified, and the trial court found, that the Borough approved and adopted the Plan and Proposal after the hearing held on August 11, 2014. (Trial court op. at 6.) Pursuant to section 10(i) of the URL, upon the Borough's approval of the Proposal, the Authority became authorized to take such action as may be necessary to carry it out. 35 P.S. §1710(i). Additionally,

---

[26] Contrary to Condemnee's assertion, individual notice of the hearing is not required and notice by newspaper publication satisfies the requirements of the URL. *See In re Condemnation by the Urban Redevelopment Authority of Pittsburgh,* 594 A.2d 1375, 1380 (Pa. 1991) ("Before deciding to approve or reject the proposal, the governing body is required to hold public hearings on the redevelopment proposal and give notice of such hearings by newspaper publication, 35 P.S. §1710(g).").

22

the Borough adopted a resolution approving the condemnation of Condemnee's property in furtherance of the Project. After the Authority filed a Declaration of Taking, to which the Condemnee filed preliminary objections, the Borough requested Boyer, its engineer, to prepare a concept design for the intersection improvement as a right turn lane.

We discern no error in the trial court's determination that Condemnee failed to prove that the real or fundamental purpose of the taking of Condemnee's property was to acquire the Station. Condemnee essentially requests this Court to infer bad faith due to the Authority's stated intentions to use the Station for the Rail project after Condemnee's property is acquired, and the timing and circumstances relating to the Authority's Rail project. The fallacy of this argument is that it fails to account for the Borough's role and involvement in the Project. Condemnee submitted no evidence that Pick, the Authority, Guest, or the Trust influenced the Borough with respect to the intersection improvements or the acquisition of Condemnee's property to accomplish the same. On the contrary, Durso testified that no one at the Authority suggested that Condemnee's property be used for the intersection improvements; rather, the decision was solely that of the Borough. Durso also testified that no one at the Borough had any interest or involvement in the Rail project.

Further, Condemnee has provided no evidence that the Borough fabricated the intersection improvement and need for the same, and devised it in a way so that the Authority could acquire the Station. There is no evidence to support Condemnee's contention that the taking was for the primary purpose of acquiring the Station for the Authority, let alone the clear, precise, and indubitable evidence required to prove bad faith. *Ohio Blenders, Inc.*, 956 A.2d at 1063.

23

**Need for the Taking**

Condemnee argues that there was no demonstrated need for the taking for either the intersection improvements or the Project. As set forth above, however, one of the enumerated goals of the Borough's Plan was to improve the intersection of Furnace Street and 1st Street, which was part of the larger Project to redevelop the industrial site and surrounding area. The trial court credited Durso's testimony pertaining to the existence of the traffic problems that served as the basis for the Borough's decision to improve the intersection. There was also testimony that the Borough and Boyer discussed putting in a right turn lane to address the traffic problems, which would require the taking of Condemnee's property.

Condemnee presented no evidence to the contrary, other than his own testimony that the improvements were not necessary and that his property did not need to be taken for improvements. Condemnee objects, however, to the sufficiency of the Borough's investigation and planning with respect to the taking, and states that no traffic counts were taken and no plans were drafted until Boyer's submission of the right turn lane concept plan after preliminary objections were filed. Condemnee argues that *more* was required to support the taking than what the Authority and Borough submitted.

Condemnee cites no authority, however, for the proposition that traffic counts and engineering plans are required. In fact, "all that is required is that an investigation be conducted so that the decision to condemn is an informed judgment." *Downington Area School District*, 557 A.2d at 821-22. Although Condemnee

24

believes that more detail should have been included as to the intersection improvement, such detail is not required. In the case of *In re Condemnation of Lands of Laughlin*, the lessee of the condemnee's property argued that the condemnor did not engage in adequate planning prior to the taking and only made real efforts to find uses for the property after the taking. 814 A.2d at 877. The lessee argued, *inter alia*, that the condemnor "did not perform a survey; engage in long range planning for use of the [p]roperty; obtain funding for the development of the [p]roperty; obtain a recommendation from a governmental agency to condemn the [p]roperty; [or] access [sic] the suitability of the [p]roperty for this use." *Id*. at 877 n.12. In that case, the condemnor produced evidence that it had planned to use the property as a park prior to the taking. We noted that the condemnor's efforts after the condemnation also supported the taking where the condemnor retained a landscape architect and solicited input from its residents. This Court stated:

> Although it is still undecided whether the [p]roperty should be left as open space or should have a memorial or some form of artwork placed on it, this fact does not change the nature of the [p]roperty's use as a park. It is only a question of what kind of park. Therefore, we hold that the [condemnor] did not abuse its discretion by condemning the [p]roperty for public park space.

*Id*. at 878.

Similarly, the testimony and evidence summarized above reveal that the Borough identified the Condemnee's property and its intention to use the same for improvement of the intersection at Furnace Street and 1st Street prior to the taking. Notably, Boyer testified that the intersection could not be expanded on the side opposite Condemnee's property because such expansion would not address the traffic problems at issue. After the condemnation was filed, the Borough took further efforts

25

by having its engineer design a concept plan for a right turn lane as the specific intersection improvement. Upon review of the record, we conclude that the Borough performed sufficient planning and investigation which led to an informed judgment with regard to the taking. Durso and Boyer testified that the Borough did not authorize its engineer to expend any more resources regarding the intersection improvements, i.e., to design more specific plans and/or make application to PennDOT for right-of-way permits, until the property had been actually acquired by the Authority. Rather than failing to perform more detailed planning due to improper motives, the more reasonable inference is that the Borough acted to conserve its limited economic resources.[27] *Appeal of Hatfield Township*, 367 A.2d 747, 750 (Pa. Cmwlth. 1977).

## Excessive

Nevertheless, a plan to take "must be tailored to the actual purpose or it will be overturned as excessive." *Middletown Township*, 939 A.2d at 338. The issue of whether a proposed taking is excessive is a legitimate inquiry and creates an issue of fact. *Beaver Falls Municipal Authority ex rel. Penndale Water Line Extension v. Beaver Falls Municipal Authority*, 960 A.2d 933, 937 (Pa. Cmwlth. 2008).

> In that regard, "[t]he quantum of land to be acquired is, within reasonable limitations, a matter within the condemnor's discretion." *In re Condemnation of Property*

---

[27] As we noted in *Pennsylvania Department of Transportation v. Montgomery Township*, 655 A.2d 1086 (Pa. Cmwlth. 1995), "a foresighted concern for avoiding waste of public funds can properly be the major motive for the state's exercise of its right to take by eminent domain." *Id.* at 1089 (quoting *In re Marivitz,* 636 A.2d 1241 (Pa. Cmwlth. 1994)).

*of Waite*,[28] 641 A.2d at 28 (citing *Truitt v. Borough of Ambridge Water Authority,* 389 Pa. 429, 133 A.2d 797 (1957)). Additionally, "[i]nasmuch as property cannot constitutionally [be] taken by eminent domain except for public use, no more property may be taken than the public use requires—a rule which applies both to the amount of property and the estate or interest to be acquired." *In Re: Condemnation by the Beaver Falls Municipal Authority for Penndale Water Line Extension,* 960 A.2d 933, 937 (Pa. Cmwlth. 2008) (citation omitted).

*In re Pennsylvania Turnpike Commission*, 84 A.3d 768, 776 (Pa. Cmwlth. 2014).

Here, the trial court credited Boyer's testimony that "taking the entire property was necessary as a partial taking would result in a lot so small that it could only be developed along the lines of a "Fotomat site" and that the site would be non-viable for use." (Trial court op. at 7.) Testimony supported that the vast majority of this small lot was necessary for the intersection improvements, and that a partial taking would result in a lot that was not commercially viable. Indeed, Condemnee testified that any taking of the property would destroy its commercial value. Further, Durso testified that more property than depicted on the concept plan may be necessary due to utility relocation and PennDOT requirements upon application for right-of-way permits. Durso also testified that any property remaining would be unable to conform to zoning. As to the land itself, we discern no error in the trial court's determination that the entire property was needed for the intersection improvements. Therefore, we conclude that the taking of Condemnee's land for such purpose was not excessive.

---

[28] *In re Condemnation of Property of Waite*, 641 A.2d 25 (Pa. Cmwlth.), *appeal denied*, 651 A.2d 543 (Pa. 1994).

27

In the event we upheld the taking of Condemnee's entire property, Condemnee requests that the Court exclude the Station from the scope of the condemnation. Condemnee argues that the Station cannot conceivably be needed for the intersection improvements, is readily movable, and he should be permitted to retain the same. As stated above, a plan to take "must be tailored to the actual purpose or it will be overturned as excessive." *Middletown Township*, 939 A.2d at 338. Further, section 9(i) of the URL provides the Authority with the power

> (i) To acquire by eminent domain any real property, **including improvements and fixtures for the public purposes set forth in this act**, in the manner hereinafter provided, except real property located outside a redevelopment area;

35 P.S. §1709(i) (emphasis added). Significantly, eminent domain is in derogation of private rights, and any legislative authority for its use must be strictly construed in favor of the landowner. *Reading Area Water Authority v. Schuylkill River Greenway Association*, 100 A.3d 572, 579 (Pa. 2014).

There is no question that the acquisition of the Station is wholly unrelated to the contemplated public purpose of intersection improvements. All testimony provided that the land was required for the intersection improvements regardless of whether there was a Station located upon it. Here, the Station is unique in that it is readily movable and has historical significance. Under these circumstances, the taking and repurposing of the Station is not consistent with the contemplated purpose. Hence, we conclude that the Authority's taking of the Station

28

was excessive, and the trial court erred in upholding the condemnation with respect to the Station.[29]

## Conclusion

We discern no error in the trial court's determination that Condemnee failed to satisfy his burden of proving bad faith by clear, precise, and indubitable evidence. Further, the trial court properly found that the taking of Condemnee's entire property was necessary for the intersection improvements and the Plan, and that the Authority was properly authorized to file the Declaration of Taking. However, the trial court erred in upholding the condemnation with respect to the Station, which is not needed for the contemplated public purpose; therefore, the Authority's taking of the Station was excessive.[30]

Accordingly, we affirm the trial court's order overruling the preliminary objections to the Declaration of Taking pertaining to the land, reverse the trial court's order overruling the preliminary objections as to the Station, and remand to the trial court to enter an order sustaining Condemnee's preliminary objections to the Declaration of Taking as to the Station only and to determine whether Condemnee is

---

[29] We find no merit in Condemnee's claim that the Authority acted without the requisite authority of the Board. Condemnee argues that the Authority enacted its resolution authorizing the condemnation of Condemnee's property prior to the Borough's adoption of a similar resolution. As noted above, however, the Authority was vested with authority to carry out its Proposal, which identified Condemnee's property for acquisition for intersection improvements, once the Proposal was approved by the Borough on August 11, 2014. 35 P.S. §1710(i). Additionally, the Borough specifically authorized the Authority's action of taking Condemnee's property by eminent domain by resolution adopted prior to the Authority's filing of the Declaration of Taking. There is no question that the Authority was authorized to file the Declaration of Taking of Condemnee's property on October 22, 2014.

[30] After the closure of the record, the Authority represented that it no longer intended to repurpose the Station for its Rail project and planned to build a replica railroad station instead. (Authority's brief, at 18 n.6.)

29

entitled to relocation costs pertaining to the same, consistent with this memorandum opinion.

_____
PATRICIA A. McCULLOUGH, Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

In Re: Condemnation Of Fee          :
Simple Or Absolute Title            :
Lands Owned By Carl B. Motta,       :
Known as 100 West First Street,     :
Birdsboro, Berks County, Pennsylvania, :   No.  2459 C.D. 2015
Containing Approximately 0.44 Acres, :
And Any and All Other Unknown       :
Occupants Or Other Parties in       :
Possession Or Interest For The Purpose :
of Road Improvements And            :
Implementing, In Part, The Provisions :
Of The Redevelopment Area Plan      :
For The Armorcast Redevelopment Area :
Located In The Borough of Birdsboro, :
Berks County, Pennsylvania          :
                                    :
Appeal of: Carl B. Motta            :

## ***ORDER***

AND NOW, this 30th day of November, 2016, the October 30, 2015 order of the Court of Common Pleas of Berks County (trial court) is hereby affirmed to the extent it overruled the preliminary objections of Carl B. Motta (Condemnee) to the Declaration of Taking relating to his land; however, the order is hereby reversed to the extent it overruled Condemnee's preliminary objections pertaining to the railroad freight station (Station).  We remand to the trial court for entry of an order sustaining Condemnee's preliminary objections to the Declaration of Taking as to the Station only and to determine whether Condemnee is entitled to relocation costs pertaining to the same.

Jurisdiction relinquished.

_____
PATRICIA A. McCULLOUGH, Judge